# In the United States Court of Federal Claims

|  |  |  |
|---|---|---|
| SLONE ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 18-669C |
| v. | ) | (Filed: July 14, 2023) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Diana Lyn Curtis McGraw and Nicholas T. Solosky, Fox Rothschild LLP, Washington, DC, for Plaintiff.

Robert C. Bigler and Russell J. Upton, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were Deborah A. Bynum, Assistant Director, Patricia M. McCarthy, Director, and Brian M. Boynton, Acting Assistant Attorney General.

## OPINION AND ORDER

**KAPLAN, Chief Judge.**

The plaintiff in this case, Slone Associates, Inc. ("Slone"), contracted with the U.S. Navy in 2010 to perform repairs on a concrete dock located at the Naval Weapons Station in Charleston, South Carolina. During the performance of the Contract, Slone's sub-subcontractor, Precon Marine, Inc. ("Precon"), encountered submerged piles of timber and buried riprap that were not reflected in the contract drawings. In addition, the Navy issued a number of unilateral modifications of the Contract both in response to obstructions Precon encountered and to address other issues that arose during contract performance.

Although the Navy provided some equitable adjustments to the contract price and time for performance, Slone alleges that these adjustments were inadequate. It seeks additional compensation based on the changes clause, Federal Acquisition Regulation ("FAR") 52.243-4, and the differing site conditions clause, FAR 52.236-2.

A four-day trial was held on Slone's claims in February 2022. See Trial Tr. vol. 1–4, ECF Nos. 67–70. For the reasons set forth below, the Court awards Slone $665,827.20 in damages, plus interest.

# BACKGROUND

## I.    Overview of the Contract

On September 30, 2008, the Navy awarded Slone a Multiple Award Construction Contract covering South Carolina and Georgia ("MACC"). Joint Stipulation of Facts ¶ 1, ECF No. 42; Joint Ex. ("JX") 1 (Contract No. N69450-08-D-1781), ECF No. 82-1. Almost two years later, on September 2, 2010, the Navy awarded Task Order No. 0005 (hereinafter "the Contract") to Slone.

Under the Contract, Slone was to perform repairs of the Transportation Command Dock ("TC Dock") located at the Charleston, South Carolina Naval Weapons Station. Joint Stipulation of Facts ¶ 2; JX 4 (drawings of structural repairs at TC Dock), ECF No. 82-4. The repair work primarily involved the demolition of portions of the existing concrete pile-supported deck, and the installation of additional concrete piles and new concrete decking. JX 4 at 4 ("Description of Construction Activity"); see also Trial Tr. vol. 1, 20:6–11 (testimony of Carlton Diggs, Precon project manager, explaining that the TC Dock project involved concrete demolition, pile-driving installation, installation and reinforcement of the concrete under the existing pier, and reinforcing areas that were weak in the pier). The total price of the Contract at the time of award was $5,433,750. Joint Stipulation of Facts ¶ 3; JX 5 at 2, ECF No. 82-5.

The heavy marine construction work the Contract required was outside of Slone's area of expertise. Trial Tr. vol. 2, 270:2–9. Therefore, Slone enlisted the assistance of Batson-Cook Company ("Batson") to help prepare its bid. Id. at 269:5–14. Unlike Slone, Batson had substantial experience in civil construction, including pile installation and heavy concrete. Id. at 275:2–10, 326:1–5.

Slone had a longstanding relationship with Batson, with whom it had successfully pursued and performed several contracts. Id. at 331:25–332:7. One month after it received the contract award, Slone entered into a subcontract with Batson. Joint Stipulation of Facts ¶ 4. The price of that subcontract was $5,175,000. Id. Thereafter, on November 18, 2010, Batson, in turn, entered into a subcontract with Precon at a price of $4,797,494.95. Id. ¶ 5; JX 7 at 3, ECF No. 82-7. Batson contracted with Precon to do most of the heavy marine work. Trial Tr. vol. 2, 327:13–21. Batson remained responsible for providing a health and safety officer and project management; it also furnished the job trailer, and set up the utilities, temporary toilets, and the trash recycling program. Id. at 333:25–334:3.

Batson's project manager, Robert Trice, was responsible for coordinating the team members at Slone and Precon. Id. at 328:17–21. He assisted with scheduling, putting together cost proposals, and preparing various submissions for presentation to the Navy, including Requests for Information ("RFIs"). Id. at 328:21–25. Mr. Trice reported to Kevin Kilpatrick, Slone's TC Dock project executive. Id. at 333:15–18.

Work under the Contract was divided into four phases. JX 5 at 5. Phase 1 involved repair and construction work from pile lines 102 to 155. Id. It was to begin on April 1, 2011, and be completed by September 30, 2011. Id. Phase 2 involved work on pile lines 77 to 102. Id. That work was to begin no earlier than July 1, 2011, and end no later than forty-five days after it

began, and in any event no later than September 30, 2011. Id. Phase 3 was to begin no earlier than April 1, 2012. Id. It was to end within forty-five days after it started and no later than June 30, 2012. Id. And Phase 4 was to begin no earlier than July 1, 2012, and end within forty-five days and no later than 730 days after the date of contract award. Id.

The work performed in each phase was repetitious. It involved opening up the existing concrete deck, repairing the concrete, driving one of the ninety-eight new concrete piles, and then closing the deck. Trial Tr. vol. 1, 20:8–19, 166:10–20; JX 5.

As Precon project manager Carlton Diggs explained, the new piles weighed over thirty tons each and were brought in on a barge. Trial Tr. vol. 1, 22:12–25. "[F]rom the barge," he testified, "they must be lofted horizontally by crane and then tripped into a vertical position." Id. at 22:25–23:2. The pile is then swung over to the pile location in the pile template and set in place with a crane. Id. at 23:2–4. The template is used to gather the pile in place as it is driven. Id. at 23:14–24:11.

Mr. Diggs further explained that the existing concrete dock was already supported by octagonal concrete piles. Id. at 38:12–16. Precon therefore had to place and drive the new concrete piles between the rows of existing piles. Id. at 38:17–18; see also JX 4 at 9 (drawings showing rows of existing piles).

Precon maintained pile-driving logs for each pile driven. JX 171, ECF No. 88-11; Trial Tr. vol. 1, 46:12–47:18. The logs identified where the piles were driven, the date and time, the length of the piles, the number of strikes needed to drive the piles, the fuel settings, and whether any obstructions were hit. Trial Tr. vol. 1, 46:12–47:18. If obstructions such as old wooden piles prevented a new pile from being driven, then the new pile would have to be removed and laid back on the barge. Id. at 41:7–42:5. Thereafter, Precon would use a steel pile extractor that it had fabricated to remove obstructions. Id. at 41:7–18. The extraction could take anywhere from a few hours to days. Id. at 41:19–21.

The Contract required Slone to "verify dimensions and all existing conditions prior to proceeding with the work." JX 4 at 1 n.1. It cautioned that "[e]xisting conditions are based on existing drawings and limited field investigation" and stated that the contractor was to "[n]otify [the contracting officer's technical representative] of any discrepancies prior to proceeding with any work." Id.

Precon conducted a five-day pre-construction survey beginning on March 23, 2011. Compl. ¶ 31, ECF No. 1; Trial Tr. vol. 1, 226:24–227:2. Because the area under the existing dock was "restricted," the Navy did not permit Precon to take a boat below the dock during its inspection. Trial Tr. vol. 1, 227:6–9. After the survey, the "discrepancies" Precon reported to the Navy were limited to the identification of some concrete spall repair work needed in areas under the dock. Id. at 226:12–17 (Mr. Diggs agreeing that the pre-construction survey only involved spall repair); Trial Tr. vol. 3, 449:7–16 (Everett "Rett" Fowler, the Navy's resident engineer, testifying that spall repair work areas were the only discrepancy from the pre-construction survey).

Over the course of contract performance, the Navy issued a number of unilateral modifications of the Contract, frequently in response to issues raised in Precon's many RFIs. See, e.g., JXs 140–41 (Modification Nos. 18 and 19, respectively), ECF Nos. 84-55–56. In some instances, the modifications included no equitable adjustments of the contract price or time for performance. See, e.g., JX 29 at 2 (Modification No. 5, stating that "[t]here is no change in the contract price or contract completion date by reason of this change"), ECF No. 82-29. In others, the Navy provided adjustments that fell short of those reflected in Precon's Requests for Equitable Adjustments ("REAs"). Compare, e.g., JX 83 at 2 (Modification No. 12, reflecting a total cost increase of $93,390.38), ECF No. 83-46, with, e.g., JX 115 at 1 (REA 8, requesting an additional $342,835.38 for Modification No. 12), ECF No. 84-30.

The final inspection of the TC Dock project took place on December 13, 2012, roughly 440 days beyond the initial contractual deadline. See JX 106 at 1, ECF No. 84-21; JX 5 at 5 (initial Sept. 30, 2011 deadline). On that date, the government accepted the contract work as complete. JX 106 at 1.

## II.   Claims Filed With the Contracting Officer

On June 19, 2017, Slone filed two certified claims with the Contracting Officer ("CO"). See JX 148 at 1–6, ECF No. 86-4. Claim one covered the first year of performance, id. at 1, and claim two the second, id. at 4. Along with the certified claims, Slone provided claims letters and supporting documentation supplied by Batson, id. at 7–10, and Precon, id. at 11–29; see also JX 144 (Precon's claim one package), ECF No. 85-1–3; JX 146 (Precon's claim two package), ECF No. 86-2.

### A.   Claim One

Claim one included a number of components. First, Slone challenged the Navy's failure to provide equitable adjustments in the contract price and time for performance based on the impact of Modification No. 4. JX 21, ECF No. 82-21. That modification swapped the scheduled sequence of work for Phases 2 and 3. See JX 144 Part 1 at 3–7, ECF No. 85-1. Claim one also included a challenge to the adequacy of the equitable adjustments provided for the eight additional work requirements contained in Modification No. 5. Id. at 7–10; see also JX 29.

In addition, Slone contended that the Navy should have provided equitable adjustments based on work Precon performed pursuant to Modification No. 7, JX 31, ECF No. 82-31, which required it to remove certain obstructions it had encountered at bents 46.5 E-F, 48.5 E-F, 48.5 F-G, and 50.5 E-F, JX 144 Part 1 at 10. Finally, Slone alleged that the timber piles and other wooden debris that it encountered at bents 42.5 B-C and 44.5 A-B constituted differing site conditions. It further claimed that two new concrete piles it installed had cracked because they made contact with the timber piles. Slone claimed that it was entitled to compensation for the remedial action it was directed to take as a result of the damage to the piles. JX 144 Part 1 at 10–12.

Slone alleged that the differing site conditions and contract modifications encompassed by claim one caused a critical path delay of 141 days and additional construction costs of $1,211,567.26. JX 148 at 1, 3. Against those costs and delays, Slone offset the $48,612 and

twenty-six days the Navy had provided in Modification No. 18. JX 140 at 3–5 (Modification No. 18). This resulted in a net claim amount of $1,162,955.26 and 115 days. Id.

**B.    Claim Two**

Claim two, covering the second year of the Contract, similarly consisted of several components. First, Slone claimed entitlement to an equitable adjustment in the contract price and time for performance based on the Navy's decision to delay the start date for Phase 2 from April 1, 2012, to April 15, 2012, and then to April 27, 2012. JX 146 at 1–2. Second, it challenged the adequacy of the equitable adjustments the Navy made based on the additional work needed to satisfy Modification No. 11. Id. at 2–3. That modification required the removal of oversized/thickened deck slabs and the repair of deteriorated concrete to allow proper diaphragm connector installation. JX 64, ECF No. 83-27. Slone also challenged the adequacy of the equitable adjustments the Navy made based on the additional work it performed to satisfy Modification No. 12. JX 146 at 3–5. As discussed in greater detail below, Modification No. 12 involved pile-driving adjustments Precon had to effect in order to avoid conflicts with an existing eighteen-inch octagonal pile. JX 83; see also Trial Tr. vol. 1, 157–64 (Diggs's testimony on Modification No. 12).

Lastly, Slone claimed that buried riprap that Precon encountered in the Phase 4 construction area constituted a differing site condition. JX 146 at 5–6.[1] In Modification No. 15, the Navy instructed Precon to remove decking to reach the riprap, excavate the riprap and store it on site, stabilize the area to facilitate pile driving, probe the pile locations to find suitable ones, install the piles, and then reinstall the riprap and reconstruct the affected pile bays. JX 87 at 2, ECF No. 84-2. As explained below, the Navy ultimately directed Precon to discontinue its efforts and return the riprap to its original location. In claim two, Precon challenged the adequacy of the equitable adjustments it received to perform these tasks before the Navy directed it to halt its work. JX 146 at 5–6, 779 (Proposed Change ("PC") No. 21).

For claim two, Slone claimed a critical path delay of 139 days and additional construction costs of $1,387,775.97. JX 148 at 4. Slone offset the delay and additional construction costs against the monies and time the government provided in Modification Nos. 11, 12, 15, and 18 (fifty-nine days and $539,761.10 in total), reducing the net amount for claim two to $848,014.87 and eighty days. Id.

**C.    Claims Packages**

Mr. Diggs prepared Precon's claims packages. Trial Tr. vol. 4, 695:10–12. Claims Package 1 contained over 1600 pages of supporting documentation. JX 144. Claims Package 2, JX 146, included over 750 pages of supporting documents. The documents submitted for both claims include, among others, daily work reports, cost breakdown reports, invoices, schedule

---

[1] Riprap is typically used for erosion control. Trial Tr. vol. 2, 288:10. It consists of large boulders and stones of different sizes that are stacked together. Id. at 288:11–14. Here, the boulders were the size of basketballs. Id. at 288:11–14; see also JX 146 at 729–30 (photos of riprap).

information, payroll reports, and work logs, as well as relevant RFIs, REAs, and PCs. See generally JXs 144; 146.

The daily work reports Precon submitted with the claims (hereinafter the "Consolidated Daily Reports") were created and completed in the months preceding the submission of the claims in June 2017. Mr. Diggs testified that he based the Consolidated Daily Reports on information he derived from the "Contractor's Daily Man-Hour Equipment Report[s]" (hereinafter the "Precon Daily Reports") which were generated each day at the time of contract performance. Trial Tr. vol. 4, 688:7–12. The Precon Daily Reports were used for timekeeping and payroll. Id. at 692:17–20. They were prepared by supervisors on the project team, acting individually and on the basis of the work they were supervising. Id. at 688:7–16, 691:17–23, 692:5–8.

The Precon Daily Reports also listed the equipment Precon maintained on site and provided a general description of the work performed that day, along with the job number and weather conditions. JX 168, ECF No. 88-8. Further, they showed whether employees were "working on contract or . . . mod[ification] work, and the man-hours and the classifications of each worker." Trial Tr. vol. 1, 77:21–24. Because the Reports were prepared by supervisors in connection with the employees and tasks for which they were responsible, there could be more than one Precon Daily Report covering the work performed on any given day. Trial Tr. vol. 4 692:2–4.[2]

To prepare the certified claims, Mr. Diggs organized, reviewed, and analyzed all of the contemporaneously prepared Precon Daily Reports. He testified that he spent several months "dissecting each [Precon Daily Report] for accuracy." Id. at 695:19–21. He examined each day's reports to break them down in detail, determining man hours, equipment costs, the work performed, and whether the work was pursuant to the original Contract or one of the modifications. Id. at 695:19–24. Mr. Diggs testified that he also went through "every log, every RFI, every email." Trial Tr. vol. 1, 70:24–71:1. He then priced each modification based on man-hours, equipment, material costs, fuel expenses, and overhead expense. Id. at 71:2–4.

The fruits of Mr. Diggs's efforts were the Consolidated Daily Reports, see JX 144 Part 1 at 197; Trial Tr. vol. 4, 695:13–24, which, as noted above, he submitted in support of the certified claims Precon eventually filed. At trial, Mr. Diggs explained why he had created the new reports to submit with the claims. He testified that Slone had submitted the contemporaneously prepared Precon Daily Reports to the Navy in support of its REAs. Trial Tr. vol. 4, 693:14–16, 694:6–19; JXs 108–16 (REAs 1, 2, 3, 5, 5.1, 6, 7, 8, and 9), ECF Nos. 84-23–31. Mr. Diggs observed that "one of the complaints from the government" with respect to its REAs "was that they could not understand our Precon daily report." Trial Tr. vol. 4, 696:2–4.

---

[2] As Mr. Diggs testified, the Precon Daily Reports were "more itemized" than the Contractor Production Reports the Navy required Precon to execute and submit on a daily basis (hereinafter the "Daily Government Reports"). Trial Tr. vol. 1, 77:19–24. The Daily Government Reports were "very general in usage" and "not user friendly to try to track or document detailed information." Id. at 73:20–23; see also id. at 78:20–25. They do not include employee names, whether activity performed is contract work or modification work, or whether equipment is used for contract or modification work. Trial Tr. vol. 4, 687:23–688:6.

Mr. Diggs assembled relevant information in the Consolidated Daily Reports to provide the additional specificity he believed he needed to support Precon's certified claims. See id. at 695:25–696:2 ("Q. And were you trying to do that to be more helpful? A. Yes.").

The Consolidated Daily Reports that Mr. Diggs prepared identify which activity each worker performed that day. If the activity was related to modification work, the Report identifies the modification number and task number. Id. at 697:1–17. The Consolidated Daily Reports that Mr. Diggs prepared also identified which of the labor was temporary and which was direct. Id. at 698:3–6. Further, the Consolidated Daily Reports break the daily activity reported in the Precon Daily Reports into separate categories for contract work and modification work. Id. at 698:17–23. Finally, while the Precon Daily Reports simply listed each piece of equipment on site, the Consolidated Daily Reports included whether the equipment was operating or on standby and whether, and to what extent, the tools and equipment (whether operating or on standby) were used for modification work. Id. at 699:4–13.

Mr. Diggs further testified that when he prepared the Consolidated Daily Reports to submit with the claims to the CO, he came across and corrected mistakes and/or inconsistencies he identified in the Precon Daily Reports. Id. at 699:14–17. For example, he explained, the Precon Daily Report might inaccurately reflect that all of the work on a particular day was performed on an overtime basis. Id. at 699:18–700:2. During his review, if Mr. Diggs came across modification work where the workers were not in overtime status, he made corrections to provide the government with the straight time rate. Id.

## III.   DCAA Audit

By letter of August 10, 2017, the CO advised Slone that the Defense Contract Audit Agency ("DCAA") would be auditing Slone's claims. JX 149, ECF No. 86-5. On November 1, 2017, the DCAA issued an adverse opinion on the claims. JX 150 (DCAA Independent Audit Report), ECF No. 86-6. It questioned $1,101,232 of the $2,058,375 in additional costs Slone had identified. Id. at 3. Among other things, the DCAA opined that Slone had overstated its material, labor, and equipment costs. Id.; see also Trial Tr. vol. 3, 564:2–16 (Joshua Stinson, DCAA auditor, testifying that the DCAA "issued an adverse opinion" focusing on "the materials, the labor piece, and the rented and owned equipment"). The audit report stated that "because of the significant effect of . . . noncompliances[,] . . . Precon's claimed amounts do not comply with the applicable requirements of FAR." JX 150 at 6; see also Trial Tr. vol. 3, 565:1–2 (Stinson testifying that "the noncompliances that [DCAA] found were material and pervasive through[out] the audit").

## IV.   The Present Suit

The Navy never issued a Contracting Officer's Final Decision on Slone's claims. See Pl.'s Post-Trial Br. at 8, ¶ 26 (citing JXs 149; 151–53), ECF No. 75 [hereinafter, "Pl.'s Br."]; Def.'s Post-Trial Br. at 18, ECF No. 79 [hereinafter, "Def.'s Br."]. They are therefore deemed denied. 41 U.S.C. § 7103(f)(5) ("Failure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim[.]"); see also K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1005 (Fed. Cir. 2015) (stating that a CO's final decision may be "implied from '[a]ny failure by the [CO] to

issue a decision on a contract claim within the period required'" (quoting 41 U.S.C. § 605(c)(5))).[3]

Slone filed its complaint here on May 10, 2018. See Compl. In it, Slone alleges that the government committed breaches of contract (including a breach of its duty of good faith and fair dealing); that the Navy is liable for damages arising out of differing site conditions; and that Slone has not been adequately compensated under the Contract's changes clause. Id. ¶¶ 108–24. In addition, at trial, Slone invoked the superior knowledge doctrine as a ground to hold the Navy liable for the increased costs and time of performance it alleges were caused by Precon's encounters with timber piles and other wooden debris in the construction area.

At trial, Slone presented the testimony of Mr. Diggs, Mr. Kilpatrick, Mr. Trice, and Robert Kelly, a scheduling and delay analysis expert. Trial Tr. vol. 1–2, 4. The government presented the testimony of Mr. Fowler; Mr. Stinson; and James Beach, the government's expert in claims analysis. Trial Tr. vol. 3. Closing arguments were held on October 18, 2022. See Closing Arg. Tr., ECF No. 91.

## DISCUSSION

### I.    Claim One

As noted, claim one involved the first year of contract performance. During that time period, work was performed in the Phase 1 and Phase 3 areas. What follows are the Court's findings of fact and conclusions of law regarding each of the separate components of claim one.

### A.    Damage to Concrete Piles Installed at Bents 42.5 B-C and 44.5 A-B

The Court begins with Slone's claim that Precon encountered differing site conditions in the Phase 3 area, namely, a proliferation of timber stubs that were the remnants of an old wooden pier. According to Slone, two of the new concrete piles that Precon installed were damaged when they made contact with the timber stubs, requiring the removal and replacement of the new piles. Slone contends that as a result of this alleged differing site condition, Precon incurred $445,981 in direct costs for equipment, labor, materials, and a subcontractor. JX 165 at 13, ECF No. 88-5; Trial Tr. vol. 1, 97:19–22. It also claims 169 days of delay arising out of the damage to the two piles. Trial Tr. vol. 1, 97:19–22.

For the reasons set forth below, the Court concludes that Slone has failed to establish that the timber stubs and other debris it encountered in the Phase 3 area constituted a differing site condition. Moreover, and in any event, the Court finds that Slone did not show by preponderant evidence that the damage to the two piles Precon installed was caused by their encounter with the timber stubs and other debris. Therefore, the government is entitled to judgment as to this claim.

#### 1.    Factual Background

On August 8 or 9, 2011, the Navy advised Precon that two concrete piles it had installed in the Phase 3 area at bents 42.5 B-C and 44.5 A-B were damaged. JX 34 at 1–2 (email from

---

[3] 41 U.S.C. § 7103 was formerly cited as 41 U.S.C. § 604 and 41 U.S.C. § 605.

Theodore Packowski), ECF No. 83-1; Trial Tr. vol. 1, 57:19–58:4. Stantec, which conducted a post-construction inspection for the Navy, reported that there were cracks between an eighth of an inch and half an inch wide at points on the piles variously between ten and eighteen feet below the mud line. JX 34 at 8 (Stantec dive inspection team report); Trial Tr. vol. 1, 58:7–11.

Precon hired SM&E, a geotechnical firm, to prepare a response to the Stantec report. SM&E opined that based on the description of the cracks as "thin, circumferential, and within the upper third of the pile," it was "plausible" that they resulted from "high tension stress generated during installation." JX 34 at 28. The report stated that "due to the relatively soft soil overlying the marl and the pile rebound during driving into the marl, controlling tension stress is a key component to successful pile installation." Id.

At Precon's request, a team of divers from Hydro Corporation ("Hydro" or "Hydro Corp") went down to survey the damage on September 28 and October 7, 2011. Trial Tr. vol. 1, 58:18–59:2; JX 51–52 (Hydro inspection reports), ECF No. 83-14–15. Hydro reported, among other things, that there were "numerous" obstructions between bents 43 and 44, "consisting mostly of old wooden pilings." JX 52 at 3. Hydro opined that "[t]he frequency and spacing of the old piles would indicate a previous structure had occupied this area at an earlier time." Id.

Hydro also reported that forty feet down (at the mudline), the dive team had found three existing piles in close proximity to the now-damaged concrete pile Precon had driven at bent 44.5 A-B. JX 51 at 2; Trial Tr. vol. 1, 59:3–15. Specifically, Hydro noted that the pile Precon had installed was three and a half inches from a broken wooden pile stub, three inches from a "battered octagonal pile," and eighteen inches from "another octagonal pile." JX 51 at 2; Trial Tr. vol. 1, 59:13–15. It also reported that at the mudline divers had observed two nearby piles that were each twelve inches away from the other damaged pile, which had been driven at bent 42.5 B-C. JX 51 at 2.

Mr. Diggs testified that even though the obstructions were not touching the installed piles themselves at the mudline, based on the way he drove the piles, they may have had contact with them. He opined that he had "probably pushed the [obstruction] outward from the concrete pile." Trial Tr. vol. 1, 59:19–24.

The government takes issue with Slone's theory that the submerged timber piles caused the two concrete piles to crack. Def.'s Br. at 34–36. It relies upon the SM&E report that Precon commissioned, which, as noted, opined that given the description of the cracks in the Stantec report, it was "plausible" that high-tension stress generated when the piles were driven caused the cracks. Trial Tr. vol. 1, 204:1–16; JX 34 at 28. Slone responds that at the time that SM&E offered up this theory, it was unaware of the veritable "forest of timber piles" that Precon's divers later discovered, as described below. Pl.'s Post-Trial Reply Br. at 37–38, ECF No. 80 [hereinafter "Pl.'s Reply"]; see also Trial Tr. vol. 1, 204:17–205:1 (Diggs testimony).

In any event, after the damage was discovered, the Navy invoked § 3.3.4 of the contractual specifications ("Rejected Piles"), JX 3 at 272, ECF No. 82-3, and instructed Precon to extract the damaged piles, Trial Tr. vol. 1, 60:9–11. Mr. Diggs, however, was concerned that extracting the piles might damage either the dock, id. at 61:6–8, or adjacent piles, id. at 62:3–7; see also id. at 60:11–19. Therefore, he consulted a marine engineering firm for advice. Id. at

9

62:14–15. Among other things, the engineering firm recommended, and the Navy agreed, that the existing broken piles should be abandoned and "bridg[ed] over . . . with four additional pile[s]," that is, that Precon should "leave the two damaged piles in place and drive four new ones." Trial Tr. vol. 1, 64:11–23; JX 144 Part 3 at 433–37 (Moffatt & Nichol correspondence dated Sept. 13, 2011, re: Damaged Piles), ECF No. 85-3.

Before driving the replacement piles, Precon had Hydro send another dive team down to investigate whether there were additional obstructions at the mudline where the replacement piles were to be driven. Trial Tr. vol. 1, 64:24–65:7; JX 52. Hydro reported back that there was "a large area of vertical wooden pile stubs" between bents 44 and 43, as well as "an obstruction approximately four [feet] below the mud line," three feet from the pile at bent 44.5 A-B. JX 52 at 2. A member of the dive team opined that the latter obstruction "consist[ed] of a section of concrete debris . . . approximately [1.5 feet] wide." Id.

With respect to the damaged pile at bent 42.5 B-C, the investigating diver reported the presence of "numerous wooden pile stubs sticking vertically out of the mud" which "were continuous across the bottom . . . with only a few feet separating one from the next." Id. The diver characterized the area across the bottom between bents 43 and 44 as "a forest of wooden pile stubs." Id.; Trial Tr. vol. 1, 65:18–20. His report concluded that obstructions in the area where replacement piles were to be driven were "numerous." JX 52 at 3. He opined that "[t]he frequency and spacing of the old piles would indicate a previous structure had occupied this area at an earlier time." Id.; Trial Tr. vol. 1, 66:2–13.

The Hydro diver's opinion that a previous structure had once occupied the area between bents 43 and 44 was ultimately confirmed months later, in the wake of Precon's July 18, 2012 encounter with buried riprap in the Phase 4 construction area, discussed below. After the riprap was discovered, Mr. Diggs requested "as-builts" of the construction site "so [that he] could determine what [he] needed to do or what [he] was dealing with." Trial Tr. vol. 1, 66:16–24; see also Trial Tr. vol. 3, 476:8–21. Two days later, Mr. Fowler responded. He explained that he had gone to an old plan file room at the Naval base and found two drawings from 1941 which showed riprap and "existing piles." JX 84 at 1 (email from Mr. Fowler re: RFI-052 Pile Obstructions Phase 4 Bents 35.5 C-D, 31.5 C-D, 22.5 B-C, & 22.5 C-D), ECF No. 83-47; see also Trial Tr. vol. 1, 67:17–25; Trial Tr. vol. 3, 476:20–477:12, 477:18–478:7. He attached drawings to his response that showed riprap in the construction area. JX 84 at 3; Trial Tr. vol. 3, 477:4–8.

Mr. Fowler also informed Mr. Diggs that he had discovered "two other full-size drawings" which he could not attach but which he described as showing "existing piles." Trial Tr. vol. 3, 477:11–478:7. According to Mr. Diggs, the drawings Mr. Fowler shared showed that a timber pier had once occupied part of the area in which Precon was supposed to drive the concrete piles in Phase 3. Trial Tr. vol. 1, 69:5–14. Mr. Fowler noted at trial that the drawings showed "a cross-section looking down the pier from the Phase 4 area, looking towards the Phase 1 area," and "a section through the pier of the [eighteen]-inch octagonal concrete piles." Trial Tr. vol. 3, 478:10–20. He also stated that the cross-sectional drawings did not show "how long" the previous pier extended into the water from the shore. Id. at 479:9–15 (agreeing that there was not "anything that would show [the length of the pier] on the current dock").

Mr. Diggs testified that the day he received copies of the drawings of the old pier was the "worst" day of his life. Trial Tr. vol. 1, 68:22. He explained that "the light bulb came on," and he realized that "this is why we have had so many problems with so many obstructions in, at that time, Phase 3." Id. at 68:23–24. He observed "that there was an existing pier, when we were trying to build an additional pile-supported pier on top of this." Id. at 69:12–14. The remnants of the existing pier, he opined, was "something that should have been revealed in the drawings." Id. at 69:14–15. Mr. Kilpatrick testified that had Slone known about the existence of the wooden pier it would not have pursued the TC Dock project at all, and if it had, it would have increased both Slone's cost estimate and the amount of time he would have expected to complete it. Trial Tr. vol. 2, 285:20–286:7.

Despite the presence of the remnants of the pier, Precon was able to drive the four replacement piles, apparently without incident. Trial Tr. vol. 1, 70:4–6.

### 2.    Type 1 Differing Site Condition

FAR 52.236-2(a)(1) provides that a Type 1 differing site condition exists when a plaintiff encounters "subsurface or latent physical conditions at the site which differ materially from those indicated in the contract." Where a differing site condition "cause[s] an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under the contract," the FAR provides that "an equitable adjustment shall be made . . . and the contract modified in writing accordingly." FAR 52.236-2(b).

To prevail on a Type 1 differing site condition claim, a contractor must first establish that "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions." Meridian Eng'g Co. v. United States, 885 F.3d 1351, 1356 (Fed. Cir. 2018) (quoting Int'l Tech. Corp. v. Winter, 523 F.3d 1341, 1348 (Fed. Cir. 2008)). A contractor "is not eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." Comtrol, Inc. v. United States, 294 F.3d 1357, 1363 (Fed. Cir. 2002) (citing P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916 (Fed. Cir. 1984)).

The indication regarding site conditions, moreover, "must be an affirmative one." Cherokee Gen. Corp. v. United States, 150 Fed. Cl. 270, 283 (2020) (citing Comtrol, Inc., 294 F.3d at 1363). The differing site conditions clause cannot be invoked if the plans and specifications "say 'nothing one way or the other about the unforeseen conditions.'" Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 695 (2005), aff'd, 509 F.3d 1372 (Fed. Cir. 2007). That is because "[i]f the contract is truly silent about [the condition], . . . there obviously can be nothing 'shown on the drawings or indicated in the specifications' from which the actual . . . conditions can 'materially' differ." Id. (quoting United Contractors v. United States, 368 F.2d 585, 595 (Ct. Cl. 1966)); see also Neal & Co. v. United States, 36 Fed. Cl. 600, 617 (1996)

(observing that "where the contract is silent, a claim cannot arise"), aff'd, 121 F.3d 683 (Fed. Cir. 1997).[4]

Slone has failed to show that the Contract affirmatively indicated that it would not encounter timber pile stubs or other remnants of an older structure in the Phase 3 area. Slone asserts that the Contract provided what it calls "positive implications that there would be no systemic obstructions." Pl.'s Br. at 27. But it cannot identify any provision in the Contract or its drawings that made representations regarding the subsurface conditions in the Phase 3 work area. Instead, Slone cites Mr. Diggs's testimony that he would have expected to see the timber piles that Precon encountered reflected in the contract drawings when Slone bid on the work. Id. at 27–28. In his experience, he stated, where obstructions were to be found, "the Government would [typically] notify you either by a note on the drawing or actually a drawing showing you where the obstructions were." Trial Tr. vol. 1, 39:12–15; see also id. at 39:21–25. Mr. Diggs asserted that the fact that there were no obstructions noted in the drawings led him to "assume" that the work area was a "virgin area" and "that there would be no obstructions." Id. at 39:10–12; see also id. at 40:10–13.

The Court found credible Mr. Diggs's testimony that—because the contract drawings did not reflect the remnants of an old timber pier—he did not expect to encounter timber stubs in the Phase 3 area (or at least that he did not expect to find as many stubs as the Hydro dive team reported). But Mr. Diggs's theory—that it was reasonable to infer that there were no such underwater obstructions because the contract drawings did not reflect any—collides with the law, under which establishing a Type 1 differing site condition requires affirmative indications, as opposed to implications drawn from contractual silence.

The cases upon which Slone relies for its argument that an "affirmative representation" can be made "through an implied contract indication" are inapposite. See Pl.'s Br. at 37. In the cases Slone cites, affirmative representations regarding subsurface conditions were implied where the contract reflected the presence of some subsurface conditions but omitted those that

---

[4] In addition to demonstrating that the contract affirmatively indicated what subsurface conditions would be, a contractor seeking "[t]o establish entitlement to an equitable adjustment due to a Type I differing site condition . . . must prove, by preponderant evidence": (1) that the contractor reasonably relied on the indications of subsurface conditions in the contract; (2) that the subsurface conditions actually encountered differed materially from subsurface conditions indicated in the contract; (3) that the subsurface conditions encountered were reasonably unforeseeable based on all information available to the contractor at the time of bidding; and (4) that the contractor's claimed excess costs were solely attributable to the material variation between the expected and encountered conditions. Comtrol, Inc., 294 F.3d at 1362; Weeks Dredging & Contracting, Inc. v. United States, 13 Cl. Ct. 193, 218 (1987), aff'd, 861 F.2d 728 (Fed. Cir. 1988); see also Int'l Tech. Corp. v. Winter, 523 F.3d 1341, 1348 (Fed. Cir. 2008); Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1274 (Fed. Cir. 2001). Because the Court concludes that the Contract did not affirmatively indicate what the subsurface conditions would be, it does not address elements 1, 2, or 3 of a Type 1 claim. It addresses causation (element 4) below in Part I.A.4.

were the basis for the plaintiffs' differing site condition claims. This case is distinguishable because here the Contract says nothing at all about subsurface conditions.

Shank-Artukovich v. United States, 13 Cl. Ct. 346 (1987), for example, involved a contract to build a mile-long hard-rock tunnel. The contract specifications warned of various subsurface conditions including raveling ground but did not mention running ground. Id. at 355. Because the contract expressly warned of subsurface conditions other than running ground, the Court held that it was implied that running ground would not occur. Id. The contract in Shank-Artukovich thus was not "silent" regarding the presence of subsurface conditions, as is the case here.

Appeal of Rottau Elec. Co., 76-2 BCA P 12001 (1976) is to similar effect. In that case, the Board of Contract Appeals held that undisclosed concrete structures that obstructed installation of manhole covers were differing site conditions. It so held because the contract plans indicated the presence of subsurface water lines yet failed to mention the presence of the concrete structures.

Appeal of Caesar Const., Inc., ASBCA No. 41059, 91-1 B.C.A. (CCH), ¶ 23639 (Dec. 10, 1990) is also inapposite. In that case, the contractor alleged that the French drain it encountered during a construction project was a differing site condition, notwithstanding that the contract drawings reflected the presence of a drainpipe. The Board observed that "[t]he pipe would not be recognized from the drawing as a french drain since the practice in the industry in depicting french drains is to describe and label them as such." Id. ¶ I.6. (Findings of Fact – Differing Site Condition Claim). It held that, absent "such [a] description, it would be reasonable to interpret the feature shown as a solid-walled storm drain [rather than a French drain]." Id. The drawings in Appeal of Caesar Const., Inc., in other words, were misleading because the drainpipe they depicted was not labelled in such a way as to make it recognizable as a French drain.

In Woodcrest Const. Co. v. United States, the contractor was presented with boring logs showing that no subsurface water was encountered. 408 F.2d 406, 410 (Ct. Cl. 1969). The Court concluded that "the inescapable impression given by the core boring logs furnished bidders by the Government could have led to only one conclusion—that there was no subsurface condition." Id. As the Court explained, "when the contractor is presented with specifications which may or may not indicate a subsurface condition, and, in addition, is presented with boring logs showing that no subsurface water was encountered, we cannot conclude that the contractor should have known of such a condition, especially since the main purpose of such borings is to indicate subsurface conditions which would not otherwise be discovered." Id. The effect of the boring logs showing no groundwater "may be the same as if a representation had been made." Id.

Slone argues that a "new and dangerous legal precedent" would be set were the Court to hold that "the absence of express representations concerning underwater obstructions forecloses any recovery under the differing site conditions clause." Pl.'s Br. at 100. "Specifically," Slone states, "it would encourage government agencies to draft bid documents with broad and ambiguous inferences with the intent of shifting the risk of a potential 'worst case scenario' to the contractor." Id. That would undermine the purposes of the differing site conditions clause which, Slone observes, is to "prevent bidders from increasing their bid prices to protect against

misfortunes resulting from unforeseen developments." Id. (quoting J.F. Shea Co. v. United States, 4 Cl. Ct. 46, 50 (1983)).

But the Court's application of the differing site conditions clause does not, as Slone claims, allow the government to employ ambiguous language in bid documents to shift to the contractor "the risk of a potential 'worst case scenario.'" Pl.'s Br. at 100. Where, as here, there are no representations at all in the contract regarding subsurface conditions, a prudent contractor must anticipate and plan for the possibility that they will nonetheless encounter the types of obstructions that occur in marine construction simply by the nature of the work. On the other hand, if the conditions encountered are so unusual that they could not have been anticipated, the contractor will be entitled to claim, as described below, that the conditions constitute Type 2 differing site conditions, and an equitable adjustment can be sought on that basis. In addition, if the government has knowledge of the presence of obstructions, but fails to disclose them, the contractor may be entitled to relief under the superior knowledge doctrine, which is also described below.

Finally, Slone cites the testimony of the government's witness, Mr. Fowler, to support its claim that the timber stubs were Type 1 differing site conditions. Mr. Fowler testified that he was of the view that the timber stubs (as well as the riprap described below) represented differing site conditions. Trial Tr. vol. 3, 494:8–23. This "lenient" view, however, see id. 493:25, was not universally held by other Navy personnel. Id. at 493:22-24 (referring to "statements from the NAVFAC Southeast Waterfront Engineer and the A/E regarding Slone's responsibility for these unforeseen conditions"). More importantly, the question of what the contract indicated with respect to subsurface conditions for purposes of applying the differing site conditions clause is a legal one. See Int'l Tech. Corp. v. Winter, 523 F.3d 1341, 1350 (Fed. Cir. 2008). The Court owes no deference, therefore, to Mr. Fowler's views on the question.

In short, the Court concludes that the timber stubs and other remnants of the old pier that Precon encountered in the area where it drove the two piles that ultimately cracked did not constitute Type 1 differing site conditions. It turns therefore to Slone's alternative argument that they constituted Type 2 differing site conditions.

### 3.   Type 2 Differing Site Condition

Type 2 differing site conditions are "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." FAR 52.236-2(a)(2); see also Randa/Madison Joint Venture III v. Dahlberg, 239 F.3d 1264, 1276 (Fed. Cir. 2001); Renda Marine, Inc., 509 F.3d at 1376 (explaining that a Type 2 differing site condition "arises when the conditions encountered are of an unusual nature and differ materially from those normally encountered in the kind of work contemplated by the contract").

"[P]roving a Type 2 differing site condition is more difficult than proving a Type 1 differing site condition, involving a heavier burden of proof and a stiffer test." Randa/Madison Joint Venture III, 239 F.3d at 1277 (citing Charles T. Parker Constr. Co. v. United States, 433 F.2d 771, 778 (Ct. Cl. 1970)). "[T]he unknown physical condition must be one that could not be reasonably anticipated by the contractor from his study of the contract documents, his inspection

of the site, and his general experience[,] if any, as a contractor in the area." Randa/Madison Joint Venture, 239 F.3d at 1276 (quoting Perini Corp. v. United States, 381 F.2d 403, 410 (Ct. Cl. 1967)).

The Court finds that Slone has failed to establish that the timber stubs and other apparent remnants of the old pier that Precon encountered during Phase 3 pile driving operations represented a Type 2 differing site condition. The Court agrees that Slone was unaware that there had previously been a wooden pier in the area where Precon installed the two piles that developed cracks. It also agrees that Slone could not have anticipated the presence of the wood debris and timber on the basis of its pre-bid inspection because the material was underwater, and the Navy did not permit bidders to take boats beneath the dock to inspect for obstructions. It further finds that there was nothing in the contract documents that would have suggested that there was once a wooden pier in the Phase 3 area, and nothing revealing that remnants of the pier could still be found under the water and below the mudline.

Slone, however, has not produced preponderant evidence showing that the conditions Precon encountered "differ[ed] materially from [conditions] ordinarily encountered and generally recognized as inhering in work of the character provided in the contract," FAR 52.236-2(a)(2), i.e., work involving underwater construction tasks, such as pile driving. The Court notes that Slone failed to call any disinterested witnesses with experience in marine construction to testify regarding the alleged unlikelihood that a contractor would encounter submerged wooden debris or timber when driving piles in connection with performing repairs on a concrete dock. As Mr. Diggs acknowledged, throughout his career, he has encountered a variety of obstructions when performing marine construction. Trial Tr. vol. 1, 186:11–13. These have included concrete, boulders, rocks, and even cars or trucks. Id. at 186:14–23. He also acknowledged that he began preparing to fabricate a pile extractor before he ever encountered any obstructions. He did so precisely because—given the nature of marine construction work— he had to anticipate that Precon might encounter such debris. Id. at 187:3–188:8. He explained that "[t]ypically, . . . in our work, you prepare for the worst case scenario," id. at 188:12–13, and that he "always expect[s] the worst case scenario on a job," id. at 189:3.

Ultimately, Slone's argument relies on the quantity and what it calls "systemic" nature of the wooden pile stubs it encountered to prove a Type 2 differing site condition. Mr. Diggs testified that it was unusual to come across a prior structure that had not been disclosed. Id. at 75:3–18. Mr. Trice stated that based on his twenty years of experience in the industry, he also did not expect to encounter an existing wooden pier beneath the surface of the TC Dock. Trial Tr. vol. 2, 339:16–20. He explained that it was "not typical . . . to encounter a whole [o]ther structure under a structure." Id. at 339:22–23.

The Court finds credible the witnesses' testimony that it is "not typical" to find a prior structure under an existing one. But it is not persuaded that the obstructions encountered were of a sufficiently "unusual nature" or that they "differ[ed] materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." FAR 52.236-2(a)(2). The Court notes that the pile stubs were predominantly found in one section of the Phase 3 area (between bents 43 and 44), not throughout the project site. See JX 52 at 3. Moreover, of the one hundred piles driven, only sixteen hit timber obstructions and, so far as the Court can tell, the obstructions were removed without causing any material delay in

performance of the Contract. See Def.'s Br. at 32. In addition, Precon ultimately drove the four replacement piles without incident. Trial Tr. vol. 1, 70:4–6.

Further, the Court did not understand the gravamen of either Mr. Diggs's or Mr. Trice's testimony to be that it is particularly unusual to find submerged timber or other debris in a marine construction area. In fact, the other solicitations involving similar work that counsel provided the Court as exemplars during closing argument all referenced the presence of timber piles underwater. See also Nova Grp./Tutor-Saliba v. United States, 159 Fed. Cl. 1, 40 (2022) (Navy solicitation for marine contract warning that contractor should expect that "unknown sizes of riprap material, pile stubs, or other debris may exist at the planned locations of piles and/or sheet piles"). Rather, the Court understood their testimony to be that they were surprised that— given the quantity and what they said was the systemic nature of the timber stubs in the Phase 3 area—there had been no mention of the old wooden pier in the contract documents. Trial Tr. vol. 1, 75:6–13 (Mr. Diggs agreeing that it is "unusual to come across a prior structure that's not disclosed" and that in light of the "systemic" nature of the piles below the dock, "[i]t should have been part of the contract documents."); see also Trial Tr. vol. 2, 339:22–24 (testimony of Mr. Trice, stating that "if [another structure is] there" it "should be identified on the [contract] drawings."); Pl.'s Reply at 26 (arguing that "[i]t is extremely unusual to encounter parts of a pre-existing structure below another structure without some indication in the Contract") (emphasis added).

These assertions, however, are really just another way of arguing, as Slone did with respect to its Type 1 claim, that the failure to depict the remnants of the timber pier in the contract drawings gave rise to a reasonable inference that there would be no such structure found in the construction area. But to establish a Type 2 differing site condition, Slone must prove that the presence of the pier's remnants, where not disclosed in the contract documents, represented a particularly unusual condition that was materially different from what one might expect to encounter in similar maritime projects. This it failed to do and so the Court must reject Slone's Type 2 differing site conditions claim.

### 4. Causation

Finally, even if the presence of the timber piles did constitute either a Type 1 or Type 2 differing site condition, in order to establish its entitlement to an equitable adjustment, Slone must show that the cracks in the two concrete piles were caused by their encounter with the timber piles. The Court is not persuaded that Slone has made this showing by preponderant evidence.

First, Slone's contention that the piles cracked because they made contact with the timber piles is based largely (if not entirely) on Mr. Diggs's testimony. He observed that it is unusual for piles to break when being driven, Trial Tr. vol. 1, 44:6–11, and that the typical cause for a break, when it occurs, is contact with an obstruction, id. at 44:19–23. He opined that the breaks here were not caused by Precon's use of high fuel settings when driving the piles, noting that the pile driving logs showed that higher fuel settings were used to drive other piles and that those piles did not crack. Id. at 56:1–57:13.

But the Court is not willing to base a finding of causation solely on Mr. Diggs's testimony. The facts show that despite the presence of pile stubs and other wooden debris in the Phase 3 area, and despite the fact that eleven of twenty-two piles driven in that area hit obstructions, Precon was able to drive all of the piles except the two at issue without cracking them. Indeed, it apparently drove four replacement piles in the same location without damaging them. Mr. Diggs did not provide any explanation for the fact that none of the other piles that hit obstructions cracked, instead merely attributing it to luck. Trial Tr. vol. 1, 230:12–13 ("Q. Were you lucky? A. I would say probably, yes.").

Moreover, Mr. Diggs's credibility regarding the cause of the pile damage is also drawn into question by the fact that the original driving log Precon submitted to the Navy in July 2011, JX 129 at 148–149, "did not indicate anything about a pile obstruction" at bent 44.5 A-B, Trial Tr. vol. 3 at 487:9–11 (Fowler testimony). Precon submitted a second driving log for bent 44.5 A-B in late September which included hand-written remarks from Mr. Diggs, Trial Tr. vol. 1, 209:7–10, stating that Precon hit an obstruction at thirty-six feet, that it appeared to be a wooden pile, and that Precon used a pile extractor to remove debris down to sixty-five feet, JX 171 at 28; Trial Tr. vol. 3, at 488:11–22 (Fowler). At trial, Mr. Diggs could not explain why there were no remarks about the obstruction in the original log. Trial Tr. vol. 1 at 210:6–9.

Further, Precon's own geotechnical consultant, SM&E, thought it plausible that the cracks at the piles driven at bents 42.5 B-C and 44.5 A-B were caused by high-tension stress generated when the piles were driven into the soft soil overlying the marl. To be sure, SM&E did not have information about the presence of the timber piles and stubs when it offered up its theory, which it based on the characteristics of the cracks in the new piles ("thin, circumferential, and within the upper third of the pile"). JX 34 at 28. But the Court has before it no evidence addressing whether the characteristics upon which SM&E relied were also consistent with the piles having hit the timber stubs. Slone did not call anyone from SM&E to explain how the presence of the stubs impacted the plausibility of the theory in their report. Instead, it chose to rely entirely on Mr. Diggs's testimony and on his belief that had SM&E known of the existence of the wooden obstructions, "it would have changed their report." Trial Tr. vol. 1, 229:1–5.

Mr. Diggs is not a disinterested observer. Understandably, when considering among several possible explanations for why the piles cracked, he would be inclined to choose contact with the timber stubs as the culprit. Slone could have called on an independent expert to substantiate Mr. Diggs's assertions but chose not to. In the Court's view, Slone's exclusive reliance on Mr. Diggs, is fatal to its effort to prove causation by preponderant evidence.

## B.   Superior Knowledge

In addition to its theory based on differing site conditions, Slone invokes the superior knowledge doctrine as a basis for finding the Navy liable for increased costs and delay resulting from Precon's encounters with timber poles and other debris that were left over from the wooden pier that had once stood at the project site. Pl.'s Br. at 21–23. The government argues that the Court lacks jurisdiction to consider this claim because Slone never presented a superior knowledge claim to the contracting officer. Def.'s Br. at 43–46. The Court agrees with the government.

Under the Tucker Act, this court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41," which is part of the Contract Disputes Act ("CDA") of 1978. 28 U.S.C. § 1491(a)(2). "The CDA," in turn, "mandates that '[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision.'" Tolliver Grp., Inc. v. United States, 20 F.4th 771, 775 (Fed. Cir. 2021) (quoting 41 U.S.C. § 7103(a)(1)). Therefore, "obtaining a final decision on a claim is a jurisdictional prerequisite to adjudication of that claim in" this court. Id. at 776 (citing 41 U.S.C. §§ 7104(b)(1), 7103(g)); Raytheon Co. v. United States, 747 F.3d 1341, 1354 (Fed. Cir. 2014)); see also M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1328 (Fed. Cir. 2010) ("[F]or the Court of Federal Claims to have jurisdiction under the CDA, the contractor must submit a proper claim—a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision.") (citing Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)).

To invoke the Court of Federal Claims' jurisdiction under the CDA, the action brought here "must be 'based on the same claim previously presented to and denied by the contracting officer.'" Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987)). The "same claim" requirement "does not require [rigid] adherence to the exact language or structure of the original administrative CDA claim." Id. "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Id. (quoting Cont. Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987)).

Requests for relief involve "separate claims if they either request different remedies (whether monetary or non-monetary) or assert grounds that are materially different from each other factually or legally." K-Con Bldg. Sys., Inc., 778 F.3d at 1005. Claims are materially different when they "necessitate a focus on a different or unrelated set of operative facts." Lee's Ford Dock, Inc. v. Sec'y of the Army, 865 F.3d 1361, 1369 (Fed. Cir. 2017) (quoting Placeway Constr. Corp. v. United States, 920 F.2d 903, 907 (Fed. Cir. 1990)).

The claims Slone filed with the CO are materially different from the claims based on the superior knowledge doctrine that it asserts here. "The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to performance." Giesler v. United States, 232 F.3d 864, 876 (Fed. Cir. 2000). To invoke the doctrine, a contractor must prove that: (1) it undertook performance "without vital knowledge of a fact that affects performance costs or direction"; (2) the government was aware that the contractor had no knowledge of and had no reason to obtain the information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991) (citations omitted).

There is nothing in Slone's certified claim that would have alerted the CO that Slone was asserting a superior knowledge claim. See JX 148. To the contrary, the Precon claim letter expressly references only the differing site conditions and changes clauses as bases for relief. Id. at 22 (claim one), 28 (claim two). The Precon letter does not even mention the drawings showing

18

the 1941 pier which, under Slone's argument, is the embodiment of the knowledge that was within the government's possession but which it allegedly withheld from Slone.

Further, the differing site conditions claims asserted in the claim letter are not based on the same operative facts as the superior knowledge claim Slone now asserts. Indeed, the facts are materially different. "The nature of a superior knowledge claim naturally focuses on "<u>what</u> the government [knew] . . . and <u>when</u> they knew it." <u>Sarro & Assocs., Inc. v. United States</u>, 152 Fed. Cl. 44, 53 (2021) (quoting <u>Laidlaw Env't Servs. (GS), Inc. v. United States</u>, 43 Fed. Cl. 44, 50 (1999)). But the government's knowledge is not a focus of proof for a differing site condition claim. The focus for Type 1 differing site condition claims is on the representations made in the contract, and for Type 2 claims it is on the extent to which the conditions encountered differ materially from those ordinarily found in work of a similar nature.

Slone's response to these points is to cite a sentence in Precon's claim letter which states that "[t]he Hydro Corp inspection report made it clear that the piles were damaged as a result of impact with previously undisclosed underwater obstructions, which were remnants of an old timber wharf." Pl.'s Br. at 104–05 (quoting JX 148 at 21). But the mere assertion that the obstructions Precon encountered were "previously undisclosed" was hardly sufficient to alert either the CO or the Court that Slone was alleging that the Navy had knowledge of these obstructions but failed to disclose them. The observation, in fact, was made in the context of Precon's recounting of the facts surrounding the two damaged piles in connection to its differing site condition claims.[5]

In short, Slone never pressed a superior knowledge claim before the CO (or in its complaint to this Court, for that matter). The CO had no notice of the claim, and the Court therefore must dismiss this claim for lack of jurisdiction.

## C.    Modification No. 4: Swapping Phases 2 and 3

On June 21, 2011, the Navy issued Modification No. 4, which unilaterally switched the scheduled sequence of work for Phases 2 and 3. JX 21. The Navy directed the change to avoid a conflict between the spall repair work scheduled to be performed during Phase 2 and certain unrelated, pile-driving activity that was taking place in an adjacent area. Trial Tr. vol. 3, 457:10–19 (Fowler describing the reason for the phase swap).

The primary issue before the Court with respect to Modification No. 4 is whether—as a result of swapping of Phases 2 and 3—Slone incurred additional costs or delays in performance. See FAR 52.243-4(d) (When the government effects a change in the method, manner, or time of performance that "causes an increase or decrease in the Contractor's cost of, or the time required

---

[5] In fact, it appears to the Court that Slone did not think to invoke the superior knowledge doctrine until sometime after it initiated the present litigation. The complaint Slone filed with this Court did not allege breach of contract under the superior knowledge doctrine. It includes four counts: (1) breach of contract based on the government's failure to compensate it for the additional costs and delay incurred to complete work required by the Navy's unilateral modifications of the contract; (2) breach of the duty of good faith and fair dealing; (3) Type 1 differing site condition; and (4) Type 2 differing site condition. Compl. ¶¶ 108–24.

for, the performance of any part of the work under th[e] contract," the Contracting Officer "shall make an equitable adjustment and modify the contract in writing."); JX 1 at 10 (incorporating FAR 52.243-4 into the Contract). Slone argues that because of the swap it had to cut down the concrete piles it had already purchased for Phase 2 so that they could be installed in Phase 3 locations. Pl.'s Br. at 68–74.

In addition, Slone argues that the Navy improperly denied it the opportunity to conduct a test pile program that would have allowed it to enjoy cost savings by purchasing shorter piles in the first instance. Id. at 70–72. Finally, Slone argues that the Navy violated its implied duty of good faith and fair dealing by misleading Slone into believing that it would be allowed to order shorter piles when the Navy had no intention of permitting it to do so. Pl.'s Br. at 75–76.

For the reasons set forth below, the Court finds all of these arguments without merit.

### 1.     Factual Background

The evidence shows that after Modification No. 4 re-sequenced the work, when Precon installed piles in the Phase 3 area, it had to use the piles that it had ordered for use in Phase 2 because the piles were loaded onto the barge in the order in which they were to be driven.  Trial Tr. vol. 1, 99:17–23. The plumb piles Precon ordered for Phase 2 were 100 feet long, and the length of the batter piles was 106 feet. JX 4 at 35.[6] Precon had to cut off between fifteen to twenty-five feet of concrete to install the piles in the Phase 3 area. Trial Tr. vol. 1, 109:17–20 ("[I]n Phase 3 [the cut off pile length] ranged from 15 to 25 feet."). In addition, because the piles were oversized, Slone had to employ a pile installation template that had an additional tier to hold the excess weight of the portions of the piles that were sticking out of the water before they were cut. Pl.'s Br. at 69 ("The longer piles caused delays and additional costs [because] an upper template was needed to support the pile as it was driven, and [it] took additional time to build the template."); see also Trial Tr. vol. 1, 25:8–16; 26:1–8.

The facts show, however, that Slone would have incurred essentially the same costs even if the sequence of work had not been changed because it would still have had to cut and support the piles had they been installed in the Phase 2 area, as originally planned. Slone's geotechnical consultant, SM&E, had estimated that the pile lengths needed for Phase 3 would be in the range of seventy-five to eighty-five feet, and that the pile lengths needed for Phase 2 would be five feet longer, in the range of eighty to ninety feet. JX 20 at 2, ECF No. 82-20 ("Table 1 – Summary of 24-in. Square (Plumb) PSC Production Pile Length Estimates"); Trial Tr. vol. 1, 109:1–6 (describing JX 20 as SM&E's "professional recommendation"). Therefore, even had Slone used the 100- and 106-foot piles for Phase 2, as originally intended, it would have had to cut off only a little less concrete than it did to use them in Phase 3.

Further, the record shows that even without the phase swap, Slone would have had to incur the expenses of fabricating an upper template. Indeed, Precon actually fabricated the template it used in the Phase 3 area during Phase 1, before Modification No. 4 was issued. Trial

---

[6] Plumb piles are driven in a straight, vertical manner, while batter piles are driven at an angle. Trial Tr. vol. 1, 24:12–23, 102:11–16 (Diggs explaining the difference between the two types of piles).

Tr. vol. 1, 177:24–178:16. Further, because there was only a five-foot difference between the pile lengths required for Phases 2 and 3, Slone would have had to build the upper template in any event to handle the oversized piles had they been installed, as originally anticipated, in the Phase 2 area. See Trial Tr. vol. 2, 360:11–361:6 (testimony of Robert Trice, Batson's project manager, agreeing that even if the oversized piles had been used in Phase 2, as originally planned, it would have still been necessary to cut them down). Therefore, the phase swap did not result in increased costs related to the length of the Phase 2 piles.

## 2.     Test Pile Program

As explained above, the costs Slone incurred arose out of its purchase of piles that were too long for either Phase 2 or Phase 3, and not out of the fact that it had to use the Phase 2 piles in the Phase 3 locations. Slone therefore shifts its focus to what it says caused it to purchase oversized piles to begin with—namely, the Navy's alleged failure to allow Slone to conduct a test pile program, which Slone contends violated the contract.[7] Slone's contention lacks merit because there is no provision in the Contract that imposes an obligation on Slone to perform a test pile program. Nor is there any obligation imposed on the government to facilitate the driving of test piles.

Under the Contract, Slone was required to secure the Navy's approval before it ordered any concrete piles. Trial Tr. vol. 1, 100:12–15 (Diggs affirming that government approval was necessary for pile orders); see also JX 3 at 271 (stating that "[t]he Contractor shall submit to the Contracting Officer for approval, an itemized list of piles prior to placing the order with the supplier" and that "[t]he list shall indicate the pile lengths required at each location as shown on the plans and the corresponding ordered length of each pile"). Precon submitted its pile list for Phases 1 and 2 for approval on January 28, 2011. JX 13 at 3–5, ECF No. 82-13. Precon stated in its submission that it intended to order batter piles that would be 106 feet long, and plumb piles 100 feet in length, id. at 53 (pile order list), consistent with the contractual drawings. It advised the Navy, however, that it intended to seek final approval regarding pile lengths after the government responded to RFI 3, which it had submitted some six weeks earlier on December 17, 2010. JX 8, ECF No. 82-8.

RFI 3 arose out of a recommendation by WPC Engineering, Environmental and Construction Services ("WPC"), the Navy's geotechnical consultant, that the contractor drive two test piles to determine depth prior to ordering piles for use in construction. Id.; see also Trial Tr. vol. 1, 35:11–14 ("Yes, [WPC] recommended two test piles be installed."), 183:1–2 ("[T]he government's geotech recommended a test pile program."); JX 3 at 313 (geotechnical report recommending that two test piles be installed within the project footprint to determine final production pile lengths). In the RFI, Precon requested that the Navy confirm the accuracy of

---

[7] As Mr. Diggs explained, a test pile program "tells you what pile lengths [to use] for the project based on the driving conditions." Trial Tr. vol. 1, 36:18–21. The contractor "record[s] the actual driving of [a] pile from the time . . . it's set to once you put the hammer and leads on it[, and the contractor] monitor[s] everything about the pile." Id. at 35:22–37:2. Mr. Diggs testified that a pile driving program is "industry standard," and "most jobs require [one]." Id. at 36:22–24.

WPC's recommendations regarding test pile lengths and locations. JX 8. Some ten weeks later, on March 1, 2011, the Navy responded simply that "test piles [are] not required." Id.

At trial, Mr. Diggs testified that, "had the [Navy] responded [to RFI 3] sooner, [Precon could] have still driven that test pile and ordered these piles in time to drive." Trial Tr. vol. 1, 218:24–219:2. But in its post-trial reply brief and in its closing argument, Slone took an entirely different tack, acknowledging that because the Army Corps of Engineers ("Corps of Engineers") permit governing the project precluded any in-water work between October and the end of March, JX 11 at 3, ECF No. 82-11, and because of the contractual twenty-eight-day cure period for concrete, Precon could not have executed a test pile program in time for it to have piles ready to drive during the next phase of work, which was scheduled to begin on April 1, 2011. JX 3 at 234; Pl.'s Reply at 41–43; Closing Arg. Tr. 10:25–11:17.

Slone has not proven that it incurred additional costs or delays as a result of Modification No. 4, that it had a contractual right to conduct a test pile program, or that the Navy's delay in responding to RFI 3 was unreasonable or caused it not to be able to employ test piles to determine the appropriate length of the piles for Phase 2 or Phase 3. The Court finds no merit, therefore, to Slone's argument that it is entitled to an equitable adjustment for increased costs or performance delays engendered by Modification No. 4.

### 3.    Breach of Duty of Good Faith and Fair Dealing

As the court of appeals has observed, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Metcalf Constr. Co., Inc. v. United States, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981)). That duty "imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." Centex Corp. v. United States, 395 F.3d 1283, 1304 (Fed. Cir. 2005) (citing, among others, Restatement (Second) of Contracts § 205 (Am. Law Inst. 1981)).

Slone contends that the government breached its implied duty of good faith and fair dealing by "purposefully and intentionally misle[ading] Slone to believe that [the Navy] would compensate Slone for any cost savings it would have incurred if shorter piles were ordered and cut-offs were not necessary, when [the Navy] had no intention of doing so." Pl.'s Br. at 75. It contends that the government "promis[ed] to issue a Contract modification to compensate [it] for any costs" incurred by the phase swap, Pl.'s Br. at 75 (citing JX 18 at 1, ECF No. 82-18), and that it "destroyed" Slone's "'reasonable expectations' regarding the 'fruits of the contract'" when it refused to reimburse Slone, Pl.'s Br. at 76 (quoting Centex Corp., 395 F.3d at 1304).

Slone's argument is not supported by preponderant evidence. Modification No. 4 was executed on September 3, 2010. JX 21. In an email dated June 10, 2011, the Navy directed Slone to proceed with the change in the sequence of work. JX 18. In that email, the Navy observed that "[t]he contractor has stated that savings in pile lengths and cutoff effort for [the] Phase 3 work area were anticipated and those savings would be quantified based on actual work performed during [the] original Phase 2 work area." Id. at 1. The email further stated that "if [the] contractor

is entitled to additional costs that could not be realized due to the shifting of Phases 2 and 3, the value will be established under a forthcoming modification." Id. at 1.

The Navy's failure to execute a modification that provided additional costs to Slone did not constitute "government action . . . specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 829 (Fed. Cir. 2010) (citing Centex Corp., 395 F.3d at 1311). To the contrary, the promise made to Slone was that "if" the phase swap resulted in additional costs to Slone, then the Navy would issue a modification providing extra compensation. The Navy did not provide additional compensation because, for the reasons set forth above, the phase swap had no effect on Slone's ability to realize cost savings by using shorter piles in the Phase 3 area. The Court therefore finds Slone's argument based on the duty of good faith and fair dealing without merit.

### D.   Modification No. 5

#### 1.   Item 1

On July 9, 2011, while attempting to set a new concrete pile in the Phase 3 area, Precon hit an obstruction at bent 44.5 B-C, about thirty-six feet below the top of the deck. See JX 109 at 12 (RFI 26); Pl.'s Br. at 10. Photographs taken of the site show the presence of wood and other debris. JX 109 at 9–10; Trial Tr. vol. 1, 113:19–114:10.

Shortly thereafter, Precon submitted RFI 26. JX 27, ECF No. 82-27. Precon advised the Navy that it could not install the new concrete pile unless the obstructions were removed. Id. In response, the Navy invoked the changes clause, FAR 52.243-4, and issued Modification No. 5. JX 29. In Item 1 of Modification No. 5, the Navy directed Precon to remove and dispose of the obstructions it had encountered at bent 44.5 B-C. Id. at 2; Trial Tr. vol. 1, 114:4–5. Precon then used the steel pile extractor it had already fabricated to remove the debris. Trial Tr. vol. 1, 114:11–16. According to Mr. Diggs, Precon incurred equipment, labor, and material costs of $44,669.40, as well as seventeen days of delay to perform this additional work. Id. at 115:14–18; JX 165 at 3.

The government does not take specific issue with Slone's calculation of the direct costs it incurred to do the work required by Modification No. 5, Item 1. Instead, it argues more generally that Slone failed to prove any of its damages claims with reasonable certainty. See Precision Pine & Timber, Inc., 596 F.3d at 833 (holding that "the party seeking damages has the burden of proving them with 'reasonable certainty'"). The Court addresses and rejects that argument below in Part III.

#### 2.   Item 2

Under the Contract, before beginning work, the contractor was required to install a turbidity curtain that encompassed the project site. JX 4 at 2 ("Contractor shall install a turbidity

curtain that encompasses the project site . . . prior to [the] start of the project.").[8] In Item 2 of Modification No. 5, which the Navy issued on July 20, 2011, Slone was directed to "[p]rovide inspections/reporting for [the] turbidity curtain as documented in [the Corps of Engineers'] authorization letter." JX 29 at 2 (Modification No. 5).

Precon installed the turbidity curtain on April 11, 2011, and started driving piles a month later, on May 11. Trial Tr. vol. 1, 189:11–16. Mr. Diggs testified that on most days when Precon was driving piles, the crew worked twelve-hour days. Id. at 117:16–19. Paragraph 4 of the authorization letter states that "[b]efore daily pile driving activities and every four (4) hours thereafter until the completion of work that day, an inspection must be performed by the contractor on the silt curtain to [e]nsure its integrity." JX 10 at 2. Therefore, the parties agree, Modification No. 5, Item 2 obligated Precon to conduct three inspections of the turbidity curtain on those days. See id.; Trial Tr. vol. 1, 117:13–15 ("[The turbidity curtains] would have to be inspected three times."), 189:22–190:1 (Diggs stating that he believed thrice-daily inspections were required).[9]

The parties are not in agreement regarding whether Modification No. 5, Item 2 also required Precon to conduct daily inspections on days when piles were not being driven. See id. at 190:12–17. Slone relies upon paragraph 5 of the Corps of Engineers' letter, which stated that "in addition to the inspection logs addressed [in Paragraph 4]," the contractor was required to "maintain daily inspections of environmental protective measures during construction." Pl.'s Br. at 76–80 (quoting JX 10 at 2, ¶ 5).

The Court agrees with Slone that the Corps of Engineers' letter (whose obligations were incorporated into the Contract through Modification No. 5, Item 2) required Slone to conduct twice daily inspections of the curtain on non-pile driving days. First, it is undisputed that a turbidity curtain is an "environmental protective measure." Indeed, Mr. Fowler acknowledged as much in his testimony. Trial Tr. vol. 3, 517:13–15.

Further, Mr. Diggs testified that it was necessary to recheck and repair the curtain "constantly" "because of the environmental conditions between the tide cycles" and "debris encountering the turbidity curtain." Trial Tr. vol. 1, 190:15–17. He explained that Precon had to conduct twice-daily inspections on non-pile driving days to ensure its compliance with permit requirements that the curtain be kept in place and that it be repaired or replaced in the event it was damaged. Id. at 21–24; see also JX 10 at 2, ¶ 4 (Corps of Engineers' letter directing that "the

---

[8] Mr. Diggs testified that the turbidity curtain is "basically a plastic curtain filled with Flotate [and] Styrofoam [that] was to encompass the whole length of the pier, approximately 1,600 feet." Trial Tr. vol. 1, 116:5–8. The curtain acts as a barrier to keep debris from going into or coming out of the open water. Id. at 116:9–18; see also JX 10 at 9, ECF No. 82-10 (Corps of Engineers letter describing purpose of turbidity curtain as "to catch oil, creosote, and flotsam, to minimize the migration of suspended particles, and [to] contain turbidity").

[9] Paragraph 4 also directed that "[a] daily inspection log will be kept current and on site at all times showing the times of the inspection, the condition of the curtain, and the name of the inspector." JX 10 at 2. The log was to be forwarded to the Corps of Engineers within five days of the completion of pile driving activities. Id.

silt curtain must have adequate positioning and anchoring devices to assure its performance," "[t]he bottom must be maintained to prevent its migration during various phases of tide and wave action," and "[i]f the curtain is damaged, pile driving must immediately cease until the silt curtain is repaired or replaced"); Trial Tr. vol. 4, 715:14–24 (Diggs's testimony stating that each day the turbidity curtain would be inspected "to make sure it was still intact" and "if it was damaged," and that Precon would submit a log to the government each day documenting its inspections), 716:21–25 (Diggs's testimony that on an almost daily basis the turbidity curtain "would get hung up on the existing fenders that the Navy had out for their ships," and that Precon therefore "had to go and make sure that the turbidity curtain was floatable, so that it could do its job"). The Court concludes, therefore, that the inspections of the turbidity curtain that Precon conducted on both pile-driving and non-pile-driving days were mandated by the terms of the Corps of Engineers' letter and therefore by Modification No. 5, Item 2.

Slone claims that from April 11, 2011, until the end of the project, it incurred $85,855.24 in equipment and labor costs to conduct one-hour inspections of the turbidity curtain every four hours on pile-driving days, and twice daily on other days, using a two-man crew. Trial Tr. vol. 1, 119:10–13; JX 165 at 5–6 (demonstrative ex. for Modification No. 5, Item 2 damages). The government responds that Precon's damages calculation lacks credibility because its labor costs are based on records created solely for purposes of supporting its claims (the Consolidated Daily Reports), and because those later-created records are inconsistent with Precon's contemporaneous records (the Precon Daily Reports). Def.'s Br. at 53–54.

The government is correct that the Consolidated Daily Reports and the Precon Daily Reports are not consistent regarding the labor hours required for daily inspections. For example, the Precon Daily Report for August 30, 2011 reflected that the inspections of the turbidity curtain that day were performed by one employee who worked two hours. JX 168 at 111. The employee who performed the inspections was identified as Michael Glover, whose title is "foreman." Id. The Consolidated Daily Report for that same day, however, lists two workers as having performed the inspections for a total of four hours. JX 144 Part 1 at 269. The employees who performed the inspections are listed as Hamilton Hayes, laborer, and Jorge Roque, welder. Id. Hundreds of Precon Daily Reports and Consolidated Daily Reports contain similar discrepancies with respect to this item. See, e.g., JX 144 Part 1 at 27–599; JX 168 at 85–150.

Mr. Diggs testified that the task of inspecting the curtain could not be safely accomplished by one individual. Trial Tr. vol. 1, 118:16–17; Trial Tr. vol. 4, 717:6–15 (describing it as a "safety violation" and "safety risk" if "one person would . . . be allowed to just get in the boat by themselves"). Further, Mr. Diggs observed there was "no way" one person could both operate the boat and conduct an inspection. Trial Tr. vol. 4, 716:16–20. He explained that the tide dropped by six feet each day causing the turbidity curtain to frequently "get hung up on the existing fenders that the Navy had out for [its] ships." Id. at 716:21–24. To address the problem, one person would have "to operate the boat, [and] the other one would assist in untangling the turbidity curtain, if needed," to ensure that the curtain could float. Id. at 716:24–717:3. Mr. Diggs further testified that when the curtain required repairs, more than two workers might have been required, but he nonetheless included only the minimum two workers when preparing the claim submitted to the CO. Id. at 717:3–5.

The government provided no evidence or argument challenging Mr. Diggs's testimony that—to ensure safety—a minimum of two workers must be on the boats when inspections are conducted. See Def.'s Br. at 17, 53–54. Nonetheless, Mr. Diggs never provided any explanation—or even a theory—why the contemporaneous Precon Daily Reports routinely stated that one worker was assigned to perform the inspections, if in fact two employees participated. As explained below, the Court rejects the government's argument that the Consolidated Daily Reports are per se unreliable because they were created several years after contract performance was completed. Nonetheless, this consistent discrepancy is completely unexplained. As a result, the Court is compelled to credit the contemporaneous Precon Daily Reports, which provide that one worker was assigned to perform these inspections.

Based on the foregoing, the Court concludes that Slone is entitled to $30,773.43 in direct costs claimed for equipment, but that the $55,081.81 it claimed for labor is excessive because it is based on the premise that two employees participated in the inspections on non-pile driving days. See JX 165 at 5–6. The Court therefore reduces by 50% the labor costs claimed, resulting in total labor costs of $27,540.91, and an overall direct cost of $58,314.34 incurred for this item.

### 3.    Item 3

The contract drawings required Slone to remove 0.75-inch diameter anchor rods and replace them with 0.75-inch diameter galvanized threaded rod. JX 16 at 2 (RFI 18) (referencing JX 4 at 41 (Drawing S-514 at Detail 2)), ECF No. 82-16. Upon inspection of the existing bollards, Precon observed that the bolts in place had a 1.5-inch diameter and not the 0.75-inch diameter represented in the Contract. Id. Precon notified the Navy of these differing site conditions in RFI 18. In response, the Navy issued Modification No. 5, Item 3, which directed Slone to replace the bolts and pipe sleeves to match existing sizes. JX 29 at 2. After crediting the government for the materials already purchased, Mr. Diggs testified that Precon incurred $2,782.06 in direct costs for additional materials related to Item 3 of Modification No. 5. Trial Tr. vol. 1, 120:23–121:17; JX 165 at 7 (demonstrative ex. for Modification No. 5, Item 3).

The government does not challenge Slone's assertion that the oversized bolts represented a Type 1 differing site condition or that Slone incurred these additional costs as a result of Modification No. 5, Item 3. The costs will be included, therefore, in determining Slone's entitlement to an equitable adjustment.

### 4.    Items 4 and 5

As reflected in RFI 22, during Phase 3, Precon encountered slabs of concrete at bents 50-51 E-F and 49-50 F that were fourteen inches thicker than indicated in the contractual drawings. Trial Tr. vol. 1, 121:21–122:4, 122:14–123:1; JX 24 at 4 (RFI 22), ECF No. 82-24. In addition, the steel beam at bents 49-50 F was eight inches wider than indicated in the Contract. JX 144 Part 1 at 8. Further, Precon discovered thickened concrete at bent 42.5, between B-C, in the form of a concrete beam. JX 23 (RFI 21), ECF No. 82-23; Trial Tr. vol. 1, 125:7–10, 127:16–24. There is no dispute that these represented Type 1 differing site conditions.

In Modification No. 5, Item 4, the Navy directed Precon to sawcut and remove the additional fourteen inches of concrete. JX 29 at 2; see also JX 23; Trial Tr. vol. 1, 126:11–21. In

26

Item 5, it directed Precon to sawcut and remove a portion of the beam at bent 42.5 B-C. JX 29 at 2. According to Mr. Diggs, Precon incurred $16,379.65 in additional direct costs and four days of delay to perform the tasks required in Item 4, Trial Tr. vol. 1, 123:2–13 (discussing JX 165 at 8), and $6,311.53 and two days of delay to satisfy the requirements of Item 5, Trial Tr. vol. 1, 128:2–10 (discussing JX 165 at 9). Once again, the government does not specifically object to these claimed costs. Therefore, the Court will include these costs in determining Slone's entitlement to an equitable adjustment.

### 5.      Item 6

The government does not deny that the misaligned diaphragm beam Precon encountered at bent 46 C-E was a differing site condition and prevented it from properly installing diaphragm connector plates. To address the problem, in Item 6 of Modification No. 5, the Navy instructed Slone to install grout and larger connectors. JX 29 at 2. Slone contends that this work resulted in its incurring $9,103.51 in additional direct costs for equipment, labor, and materials, as well as six days of delay. Pl.'s Br. at 66–67; Trial Tr. vol. 1, 130:17–22. The government notes no specific objection to these additional costs, and they will be included in determining Slone's entitlement to an equitable adjustment.

### 6.      Items 7 and 8

In July 2011, Precon discovered an existing octagonal pile from the original TC Dock while attempting to set piles at bent 48.5 F-G. Pl.'s Br. at 55 (citing JX 29); JX 144 Part 1 at 10. In Items 7 and 8 of Modification No. 5, the government directed Slone to change the battered pile at bent 48.5 F-G to a plumb pile and make the new concrete pile at bent 46.5 F-G a 4:12 battered pile. JX 29 at 2. The battered pile at bent 46.5 F-G also had to be shifted seven inches to the south to clear the original deck pile cap. Id. Slone claims additional equipment and labor costs of $8,219.63, and a one-day delay to take these actions. Pl.'s Br. at 55–56; Trial Tr. vol. 1, 132:13–18. The government has noted no opposition to this cost. It will therefore be included when determining Slone's entitlement to an equitable adjustment.

### 7.      Offsets for Modification No. 5

The Navy did not provide any increase in the contract price for the additional work required by Modification No. 5. Instead, it deleted two polymeric piles from the project, which it initially valued at $48,000 (the cost of the piles plus the labor to install them). JX 29 at 2. Slone, however, had already purchased the piles. Trial Tr. vol. 1, 133:6–11. The Navy subsequently claimed a lower credit that encompassed only the cost of installation of the piles, which it estimated was $16,000 per pile, or a total of $32,000. JX 119 at 13, ECF No. 84-34. Mr. Diggs, however, testified that the cost of installing the piles would have been approximately $5,000 per pile, or $10,000. Trial Tr. vol. 1, 134:3–5. The Court credits Mr. Diggs's testimony as to the saved labor costs, given his familiarity with the project. In addition, Modification No. 18 added an additional $30,051 to the contract price for all of the Modification No. 5 work. JX 140 at 3.

### E.      Modification No. 7

On July 27, 2011, also while performing work in the Phase 3 area, Precon encountered additional obstructions at bents 46.5 E-F, 48.5 E-F, 48.5 F-G and 50.5 E-F, where it was

attempting to install and set concrete piles approximately ten feet below the mudline. JX 30 (RFI 34), ECF No. 82-30; Trial Tr. vol. 1, 135:4–16. In two of these four locations, Precon retrieved small pieces of wood where it had tried to drive the concrete piles. JX 30; Trial Tr. vol. 1, 135:9–16. Mr. Diggs testified that he understood the obstructions to be remnants of the 1941 timber pier. Trial Tr. vol. 1, 136:22–137:2.

The next day, on July 28, 2011, the Navy issued Modification No. 7. JX 31. That modification directed Precon to remove and dispose of the obstructions at all four locations. Id.; Trial Tr. vol. 1, 136:8–12. Precon alleges, and the Court finds, that Precon incurred labor and equipment costs of $47,540.07, as a result of the work directed in this modification. JX 165 at 12 (demonstrative ex. for Modification No. 7); Trial Tr. vol. 1, 143:12–14.

To offset the increased costs, the Navy deleted two additional polymeric fender piles from the Phase 4 work area, which it valued at $48,000. JX 31. The Navy also added $18,561 for Modification No. 7 in Modification No. 18. JX 140 at 3.

Slone, however, had already purchased the piles when the modification was issued. JX 9 (invoice for polymeric piles), ECF No. 82-9. The savings therefore were for labor to install them, which, as noted, Mr. Diggs estimated was approximately $5,000 per pile, or $10,000. Trial Tr. vol. 1, 137:18–138:2. The total credit due the government for Modification No. 7 was therefore $28,561.

## II.   Claim Two

As previously noted, claim two arises out of the second year of contract performance. During that time period, work was performed in the Phase 2 and Phase 4 areas. The following are the Court's findings of fact and conclusions of law regarding each of the separate components of claim two.

### A.   <u>Postponement of Phase 2 Start Date</u>

In claim two, Slone alleges that the Navy delayed the start date for Phase 2 of the project, impacting its critical path and causing Slone to incur damages while its equipment remained in standby status. Pl.'s Br. at 14. This claim lacks merit.

As described above, in Modification No. 4, the Navy directed that "[w]ork originally scheduled for Phase 2 will now be deferred to [the] original Phase 3 schedule." JX 21 at 2. That original schedule provided for Phase 3 work to begin "no earlier than [April 1, 2012]." JX 5 at 5. The work was to be completed forty-five calendar days after it started, "and no later than [June 30, 2012]." Id. Pursuant to the modification, therefore, the window for starting the Phase 2 work opened on April 1 and closed on May 15 (forty-five days before June 30).

Under the original project schedule the Navy prepared, the Phase 3 (now 2) work could not begin until another contractor (Crowder) completed its work removing unexploded ordnance in an adjacent area. JX 146 at 532; see also Trial Tr. vol. 1, 147:5–14, 148:10–21 (Diggs explaining that pile-driving operations could not be performed concurrently with adjacent unexploded ordnance work). In the project spreadsheet, this work (referred to as the "UXO

Finger Pier") was originally scheduled to be completed by April 15, with Phase 3 (or 2 as modified) work to then commence. JX 146 at 532; Trial Tr. vol. 1, 148:3–9.

On March 29, Mr. Diggs emailed the Navy to find out whether the April 15 start date initially established for Phase 2 was still operative. He told the Navy that he needed to know whether the date had changed because Slone was planning to begin shipping barges and equipment on April 5, and that they would arrive at the TC Dock on April 10 or 11. JX 146 at 535.

The Navy responded that same day (March 29) that the "exclusion zone" would be in place until close of business on April 20, so that "Phase 2 work would most likely begin Monday [April 23] unless it would be desired to start on the weekend." Id. at 534. Slone responded in turn the next day (March 30) that it planned to place all the equipment prepared for delivery on standby at its facility starting April 15 for delivery by April 23. Id.

Some ten days later, in an April 11 email, Mr. Diggs requested confirmation that April 23 was still the anticipated date for Precon to begin Phase 2 work. He referenced a meeting that had been held the preceding day (April 10). At the meeting, April 23 was again identified as the start date for Phase 2. However, Mr. Diggs observed, he had been advised by Crowder that it would not complete its excavation work until April 27. Id. at 537. Apparently, the contractor had found some additional unexploded ordnance that pushed back its completion date. Trial Tr. vol. 1, 148:12–14. Mr. Diggs asked the government to "please confirm[]" the April 27 date, so "that Slone/Precon Marine can schedule Mobilization of Phase 2." JX 146 at 538. "Once equipment and barges leave [Virginia]," Mr. Diggs warned, "there is no stopping." Id. The next day, April 12, the government sent an email to Mr. Diggs stating that a conference call had just been held "with the other affected parties." It again postponed the start of Phase 2, stating that "the earliest possible start date" was now April 27. Id. at 537.

In its opening post-trial brief, Slone observes that Phase 2 "was expected to commence on April 1, 2012," but that it was delayed until April 27, as a result of the work being performed by the other contractor "adjacent to the Project site." Pl.'s Br. 13–14, 82. In its reply, it further contends that "[t]he Government previously directed Slone that it could commence Phase 2 on April 15, 2012 once UXO activities were complete" but that "[t]he delayed start of April 27, 2012 caused Slone to incur damages while equipment for Phase 2 work remained in standby." Pl.'s Reply 48–49 (citing JX 146 at 532).

Slone's argument that it is entitled to damages based on having to keep its equipment in standby for twelve days (between April 15 and 27) lacks merit. Nothing in the Contract required that Phase 2 begin on April 1 or, for that matter, April 15. Instead, as Mr. Diggs acknowledged at trial, Trial Tr. vol. 1, 206:2–5, the Contract provided a window for the start of Phase 2 of April 1, 2012, to May 15, 2012, see JX 5 at 5. The window allowed the parties to adjust the start date in light of changing circumstances.

Moreover, Slone's assertion that the government told it that it could start work on April 15 is not supported by the record. It relies upon a Navy project management chart, Pl.'s Reply at 49 n.188 (citing JX 146 at 532), which listed April 15 as the date on which UXO would finish its work and Slone would begin its work. But Slone was advised as early as March 29 that UXO

would not finish until April 20, and then was updated on April 12 of an additional delay until April 27.

The Navy's decision that performance of the Phase 2 work would commence on April 27 is consistent with the Contract as altered in Modification No. 4. Slone's request for an equitable adjustment based on a delay in the start date is therefore without merit.

### B.    Modification No. 11

Slone next asserts that it incurred $37,884.56 in direct costs for its removal of thickened concrete slabs at bents 96.5 E-F and 97.5 E-F as required by Modification No. 11. Trial Tr. vol. 1, 154:20–157:2. The government does not take specific exception to those direct costs.

### C.    Modification No. 12

On September 19, 2011, Slone submitted RFIs 41 and 42, in which it advised the Navy that during a pre-construction survey of the Phase 2 area it had discovered existing concrete piles at bents 100.5 and 96.5 whose presence it believed would complicate the installation of new concrete piles as required by the Contract. JXs 46–47, ECF Nos. 83-9–10. The conflict Slone identified was not disclosed in the contract documents. Trial Tr. vol. 1, 163:12–20.

The Navy responded to the RFIs a number of months later, in early February 2012, by requesting that Precon submit a sketch depicting how the piles needed to be adjusted. JX 115 at 46. Precon provided the sketch and other information, but the CO concluded that Precon's sketch appeared inaccurate. JX 115 at 52. There was additional back and forth between Precon and the Navy over the next few months. See id. at 57–64. By the end of April, however, Mr. Packowski, one of the engineers the Navy assigned to the project, remained of the view that the measurements in Precon's sketch did "not seem to accurately portray the conditions." JX 115 at 66. He recommended that a "professional surveyor complete an inspection." Id.

Mr. Diggs testified that Precon had made seven unsuccessful attempts to install the pile at bent 96.5 F and G. Trial Tr. vol. 1, 162:11–16. On one occasion, Mr. Packowski observed Precon's unsuccessful efforts. Id. at 160:18–161:8. On another, Mr. Fowler was present. Id. at 162:13–16.

On May 18, 2012, the parties signed off on bilateral Modification No. 10. JX 67 (Modification No. 10), ECF No. 83-30. It directed Precon to "prob[e] at bents 100.5 A-B, B-C and 96.5 F-G in order to find [an] appropriate location for pile installation." Id. at 3. The modification stated that the existence of the obstructing piles was "an unforeseen site condition . . . impact[ing] installation of new piles in pile bays." Id. Modification No. 10 increased the total contract price by $23,883.00 and extended Phase 2 by two days. Id.

Precon conducted the probe and determined that it could not shift the pile to clear the obstruction. Trial Tr. vol. 1, 161:19–162:18; JX 146 at 706 (May 23, 2012 email from Chris Boyce, quality control manager, describing Precon's execution of Modification No. 10). On June 18, 2012, it submitted a proposed contract modification to resolve part of the conflict. JX 75 at 2, ECF No. 83-38.

30

On July 20, 2012, the Navy issued unilateral Modification No. 12, which directed Slone to relocate the piles at bents 100.5 A-B and B-C to bent locations 99.5 A-B and B-C, to change the pile at bent 96.5 F-G to a battered pile west 4:12, and to change the pile at bent 96.5 E-F to a tension no stinger ("TNS") pile. JX 83; JX 146 at 724–26. The modification required that dynamic testing be performed on the TNS pile. JX 146 at 725; Trial Tr. vol. 1, 164:2–7. Modification No. 12 provided an equitable adjustment of $93,390.38 and a twenty-seven-day extension of Phase 2 to allow Slone to complete the work. JX 83 at 3; JX 146 at 726. Precon thereafter drove the concrete piles as directed at bent locations 96.5 F-G, 96.5 E-F, and 99.5 A-B and B-C, and performed the other adjustments required by Modification No. 12. Trial Tr. vol. 1, 164:8–13.

At trial, Mr. Diggs testified that the additional equipment, labor, subcontractor, and material costs it incurred to perform the work required by Modification No. 12 totaled $208,789.72. Trial Tr. vol. 1, 165:4–9; see also JX 165 at 17 (Modification No. 12 costs). The government objects that this figure is unreasonable as evidenced by the fact that the majority of the costs claimed (81%) were for equipment ($168,234.17). Def.'s Br. at 39 (citing JX 165 at 17). It notes that Slone has not explained how it arrived at the total amount claimed, and states that "it is difficult to comprehend how making changes to the location and installation of four piles could result in $168,234.17 in equipment costs" ($23,382 for a crane barge; $20,933.90 for a 60-ton crane; over $50,000 for an ICE Vibro 44-50 (pile driver hammer) and a Crawler crane; and $27,000 for a tug boat). Id. It further notes that the $50,000 equipment charge for the hammer and Crawler crane was based almost exclusively on standby hours, not operational use. Id.

The Court finds that Slone has provided a reasonable basis for the costs it claims. As Slone notes, Mr. Diggs derived equipment costs for all of the modifications on the basis of the information contained in the Consolidated Daily Reports, as well as other project records. Pl.'s. Reply at 67; Trial Tr. vol. 1, 79:5–80:6. Further, the Court understands that equipment was put in standby mode because of the presence of the old concrete piles that prevented Precon from installing new ones at bents 100.5 and 96.5. Given that most of the equipment on site was employed for the installation of new piles, it is not surprising that the standby costs were high. Therefore, the Court finds that Slone incurred additional direct costs of $208,789.72 to implement the changes required by Modification No. 12.

## D.   Modification No. 15

On June 29, 2012, Slone submitted RFI 50, in which it notified the Navy that it had identified pile obstructions at bents 26–31 E-G, consisting of riprap of unknown thickness. JX 80, ECF No. 83-43. On July 14, 2012, Precon followed up with RFI 52. JX 82, ECF No. 83-45. It reported encounters with wood debris and riprap while attempting to install concrete piles in the Phase 4 area at bent locations 35.5 C-D, 31.5 C-D, 22.5 B-C, and 22.5 C-D. Id.

On July 18, 2012, referencing the riprap, Mr. Diggs requested "as-builts" of the construction site "so [that he] could determine what [he] needed to do or what [he] was dealing with." Trial Tr. vol. 1, 66:16–24; see also Trial Tr. vol. 3, 476:8–21. Two days later, Rett Fowler provided the two drawings from 1941, discussed above, which showed riprap and "existing piles." JX 84 at 1 (email from Rett Fowler re: RFI-052 Pile Obstructions Phase 4 Bents 35.5

C-D, 31.5 C-D, 22.5 B-C and C-D); Trial Tr. vol. 1, 67:17–25 (Diggs testimony); Trial Tr. vol. 3, 476:20–477:12, 477:18–478:7 (Fowler testimony). He attached drawings to his response that showed riprap in the construction area. Trial Tr. vol. 3, 477:4–8; JX 84 at 3 (highlighted area).

On July 27, 2012, Precon proposed to remove portions of the concrete deck to excavate the riprap, drive the piles, and then reinstall the riprap. JX 85 (PC 21), ECF No. 83-48. On September 19, 2012, citing the changes clause, the Navy issued unilateral Modification No. 15. JX 87. It instructed Slone to remove deck at pile bays 22.5 D-E, 31.5 D-E, and 35.5 D-E so that it could reach riprap and timber piles that were obstructing new piles at bents 35.5 B-C, 31.5 B-C, 22.5 B-C, and 22.5 C-D. Id. at 2. Precon was directed to excavate the riprap and store it, and afterward to stabilize the area and install the piles, reinstall the riprap, and reconstruct pile bays 22.5 D-E, 31.5 D-E, and 35.5 D-E. Id.; Trial Tr. vol. 1, 89:14–90:7. Modification No. 15 deleted eleven piles from Phase 4 and provided an equitable adjustment to the contract price of $174,268, as well as a twenty-one day extension of the contract deadline. JX 87 at 2.

Removing the existing riprap was difficult and time-consuming work. Trial Tr. vol. 2, 290:17–291:1 (Kilpatrick testimony). Precon was limited in the equipment it could use for excavation because of the size of the openings in the concrete deck through which the riprap would have to be removed. Id. at 290:20–23. In addition, as it was excavating the riprap, Precon encountered two large concrete slabs under the pier whose removal was also required. Trial Tr. vol. 1, 90:11–91:23.

After what Mr. Diggs characterized as "weeks and weeks" of "fruitless" attempts to remove the riprap, on November 15, 2012, the Navy directed Precon to stop its excavation work. Id. at 91:22–93:4. It further directed Precon to replace the riprap it had removed, delete the remaining uninstalled piles, rebuild the deck, "reclaim" the removed concrete slabs, and store the now-extraneous piles on the dock. Id. at 92:16–93:11; JX 102 (PC 23).

Slone alleges that the submerged riprap constituted a Type 1 differing site condition. The Court finds it unnecessary to address this contention, because, in any event, the Navy treated the riprap as a differing site condition by issuing Modification No. 15, specifying the work Precon was to perform to address the effects of the submerged riprap on pile installation.

In Modification No. 15, the Navy provided an equitable adjustment in the contract price of $174,268. JX 87 at 2. Slone claims, however, that it incurred increased direct costs of $495,760.37 arising out of its performance of Modification No. 15, as well as 157 days of delay. Pl.'s Br. at 53–54; see also JX 146 (Precon's claim two); Trial Tr. vol. 1, 94:18–20. Again, the government mounts no direct challenge to Slone's computation of the direct costs it incurred to effect this modification and the Court finds that Slone's figure is a reasonable one.

### E.   Modification No. 19

On April 27, 2019, the Navy issued a unilateral modification assessing liquidated damages against Slone based on the fact that Phases 3 and 4 were not timely completed. The total assessed was $121,925, consisting of $88,125 for Phase 3 and $33,800 for Phase 4. JX 141 at 2 (Modification No. 19).

## III.    Damages

It is well established that "the party seeking damages has the burden of proving them with 'reasonable certainty.'" Precision Pine & Timber, Inc., 596 F.3d at 833. "The ascertainment of damages," however, "is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting Elec. & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1358 (Ct. Cl. 1969); see also Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968 (Ct. Cl. 1965) ("It is sufficient if [a plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate.").

As described above, the government opposes Slone's damages claims generally on the grounds that, among other things, it did not provide a sufficient explanation of how it calculated the actual costs Precon incurred. Def.'s Br. at 56. The government further contends that "to the extent that its damages are based upon actual documentation, the 2017 daily reports that are attached to the claim and are the basis (to the extent there is one), for Slone's damages calculations are unreliable as they were created approximately four years after the project was completed for the sole purpose of supporting Slone's claim." Id. It also argues that the figures are suspect because the bulk of the costs claimed for most of the modifications were equipment costs, many of which were for standby hours. Id. at 58–59. The Court finds these challenges to Precon's methodology and documentation unpersuasive.

### A.    Actual Costs Incurred

"While there are many recognized methods for calculating damages in an equitable adjustment claim, the 'actual cost' method is the preferred method." Agility Def. & Gov't Servs., Inc. v. United States, 134 Fed. Cl. 723, 729 (2017) (citations omitted). That is the method that Slone employed here. At trial, Mr. Diggs testified that in preparing Precon's claims, he reviewed all of the receipts for materials and equipment, as well as the certified payroll and contemporaneous project documents. Trial Tr. vol. 4, 704:8–14. Joint Exhibit 165 (a demonstrative exhibit) summarizes the direct costs derived from the documentation that Mr. Diggs reviewed and analyzed, including the information in the Consolidated Daily Reports.

The Court finds unpersuasive the government's argument that the Consolidated Daily Reports are unreliable solely because they were created several years after contract performance. Mr. Diggs testified that the Consolidated Daily Reports were created on the basis of the information contained in the Precon Daily Reports, as well as other contemporaneously created documents (such as invoices and receipts for materials, and payroll records).

Moreover, the fact that the Consolidated Daily Reports were prepared for the purpose of supporting Slone's claims does not render them less reliable as the government suggests. Nor is it accurate to characterize them as documents "prepared for purposes of litigation." Def.'s Br. at 60. To the contrary, Slone was required to certify the accuracy of its claims and supporting documentation when it submitted them to the contracting officer. See 41 U.S.C. § 7103(b)(1). In addition, Mr. Diggs explained that the reason he decided to create the Consolidated Daily

Reports, and not rely on the Precon Daily Reports to substantiate costs incurred, was to provide the clarity and detail that the Navy found lacking in the Precon Daily Reports when they were submitted in support of Precon's REAs. See Trial Tr. vol. 4, 695:19–696:4, 698:17–23.

The Court further rejects the government's argument that the operational and standby equipment hours set forth in the Consolidated Daily Reports and the attribution of those hours to either contract or modification work are not reliable because the original Precon Daily Reports did not track this information. Def.'s Br. at 59–65. While the Precon Daily Reports did not include the hours of use and standby time for each piece of equipment, they did list the equipment that was on site each day. They also described the tasks performed that day. The Court understands that—along with the Precon Daily Reports—Mr. Diggs relied upon all of the project records and his own intimate familiarity with the work when reconstructing the operational and standby equipment hours and attributing them to either contract or modification work.

The Court credits Mr. Diggs's testimony—described above—that he spent months preparing the Consolidated Daily Reports, and that he "dissect[ed]" the Precon Daily Reports for accuracy. Trial Tr. vol. 4, 695:19–21. It also credits Mr. Diggs's testimony that he went through "every log, every RFI, [and] every email" in preparing the comprehensive Consolidated Daily Reports. Trial Tr. vol. 1, 70:24–71:2.[10]

Therefore, the Court finds that the Consolidated Daily Reports and other documentation, as well as the testimony of Slone's witnesses (foremost among them Mr. Diggs), provide a reasonable basis for computing the damages due to Slone. Further, with the exception of the labor hours associated with the inspections of the turbidity curtain (discussed above), the Court credits Slone's calculation of costs it incurred to execute the relevant contract modifications.

On those bases, and in light of the testimony and documentation, the Court finds the actual costs Precon incurred are as follows:

| | |
|---|---|
| Modification No. 5, Item 1 | $44,669.40 |

[10] In its post-trial brief, the government appears to acknowledge that the Consolidated Daily Reports were admissible into evidence because they were attached to the claims Slone submitted to the contracting officer. Def.'s Br. at 60 (observing that "the 2017 daily reports were admitted into evidence because Slone attached them to its claims"); see also PR Contractors, Inc. v. United States, 69 Fed. Cl. 468, 471 (2006) (A claim for an equitable adjustment is admissible, at minimum, "to show it was duly submitted to the contracting officer . . . as required for this Court to have . . . jurisdiction under the Contract Disputes Act."). It contends nonetheless that the Court should not give any credence to the Reports because they constitute "unreliable hearsay." Def.'s Br. at 60. For the reasons set forth in the text, the Court finds the Consolidated Daily Reports sufficiently reliable, in conjunction with the other documentary evidence, and Mr. Diggs's testimony, to support Slone's equitable adjustment claims. Cf. PR Contractors, Inc., 69 Fed. Cl. at 471 (The Court may accept statements in a claim as fact when the contractor provided "further substantiation in the form of credible testimony or reliable documentation.").

| Modification No. 5, Item 2 | $58,314.34 |
| Modification No. 5, Item 3 | $2,782.06 |
| Modification No. 5, Item 4 | $16,379.65 |
| Modification No. 5, Item 5 | $6,311.53 |
| Modification No. 5, Item 6 | $9,103.51 |
| Modification No. 5, Items 7 & 8 | $8,219.63 |
| Modification No. 7 | $47,540.07 |
| Modification No. 11 | $37,884.56 |
| Modification No. 12 | $208,789.72 |
| Modification No. 15 | $495,760.37 |
| **Total** | **$935,754.84** |

### B.   Delay Damages

In addition to its actual costs, Slone contends that it is entitled to damages it incurred as a result of 256 days of delay for which it claims the government is solely responsible. According to Slone, the 256 days includes 20 days in Phase 1, 33 days in Phase 2, 141 days in Phase 3, and 62 days in Phase 4. Pl.'s Br. at 117. For the reasons set forth below, the Court concludes that Slone is entitled to compensation for seventeen days in Phase 2 and sixty-two days in Phase 4. It further finds that Slone is not entitled to any delay damages for Phase 1 because it has failed to establish that the government caused the delay. It is not entitled to delay damages for Phase 3 because of the Court's conclusion that the damage to the two piles it had to remove and replace in the Phase 3 area was not caused by differing site conditions.

#### 1.   Standards

Where a contractor bases a claim upon government-caused delay, "the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994). "For the government to be found to have caused compensable delay, the general rule is that the government must have been 'the sole proximate cause of the contractor's additional loss, and the contractor would not have been delayed for any other reason during that period.'" George Sollitt Constr. Co. v. United States, 64 Fed. Cl. 229, 238 (2005) (quoting Triax–Pac. v. Stone v. United States, 958 F.2d 351, 354 (Fed. Cir. 1992)); see also Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982) (observing that the general rule is that "[w]here both parties contribute to the delay 'neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and the expense attributable to each party'"

(quoting Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 714–715 (1944))). Proving the extent of delay and that it was proximately caused by the government requires a plaintiff to demonstrate "that the government's actions affected activities on the critical path of the contractor's performance of the contract." Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1317 (Fed. Cir. 2000).

## 2.     Testimony of Slone's Delay Expert

Slone's delay damages claim is based on the testimony of its expert, Robert Kelly. Mr. Kelly is a construction, project controls, claims and dispute resolution consultant who has practiced in the project controls and claims and dispute field for more than thirty years. Trial Tr. vol. 2, 368:20–21, 376:20–24; see also JX 160 at 2–10 (curriculum vitae of Robert D. Kelly, Jr.), ECF No. 87-10. Mr. Kelly possesses certification as a Project Management Professional from the Project Management Institute, and he is also certified by the Association for the Advancement of Cost Engineering ("AACE") International as a Planning & Scheduling Professional and a Certified Forensic Claims Consultant. Trial Tr. vol. 2, 369:4–13. At trial, and without objection, the Court qualified Mr. Kelly as an expert in scheduling and delay analysis. Id. at 376:25–377:3.

Mr. Kelly testified that he used an "as-planned versus as-built analysis" to retrospectively identify the delays to the critical path that occurred during each of the four phases of the TC Dock project. Id. at 377:17–18. The as-planned schedule Mr. Kelly used was the project's approved baseline schedule. Id. at 414:5–13; JX 158 (TC Dock baseline schedule), ECF No. 87-8. The items that were on the project's critical path were identifiable from that schedule, he testified, because they are the tasks for which the schedule assigned zero days of "float." Trial Tr. vol. 2, 394:11–20 (observing that "[w]hen you have zero float, a day of delay to the activity equals a day of delay to the project"); see also Wilner, 24 F.3d at 1399 n.5 (observing that "[a] delay to an activity that is on the 'critical path' usually results in a corresponding delay to the completion of the project"); Nova Grp./Tutor-Saliba, 159 Fed. Cl. at 51 ("Critical path work includes 'items of work [that] are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed.'" (quoting R.P. Wallace, Inc. v. United States, 63 Fed. Cl. 402, 408 n.10 (2004))). Among the tasks with zero float under the as-planned schedule, which were therefore on the critical path, was the task of driving the piles into the locations identified in the contract drawings. Trial Tr. vol. 2, 394:7–395:7.

The "as-built" schedule Mr. Kelly used to determine critical path delay was created sometime in 2015 or 2016 by Bubba Hughes, an employee of Batson, in consultation with Slone and Precon. Trial Tr. vol. 1, 173:6–13; Trial Tr. vol. 2, 345:25–346:9. Mr. Diggs characterized Mr. Hughes as a "professional scheduler." Trial Tr. vol. 1, 207:17–19. According to Mr. Trice, "[w]ith Precon's assistance and the daily logs, Bubba took all those reports and basically mapped out . . . how it all fit together and where the delays were." Trial Tr. vol. 2, 346:5–8. Mr. Diggs testified that he and Mr. Hughes "went through the construction dailies, and after inputting all the information into the schedule, going back and individually identifying each impact as it affected the schedule." Trial Tr. vol. 1, 138:15–18.

According to Mr. Diggs, he and Mr. Hughes did not use the existing critical path schedule that Precon had updated periodically during the project because it did not contain enough information. Id. at 208:7–12. He further testified that by using the daily reports and other

project records to create a new as-built schedule, they were able to track each problem that arose during contract performance. Id. at 231:14–21.

Mr. Kelly testified that he reviewed the project records to confirm the accuracy of the as-built schedule that Mr. Hughes created. Trial Tr. vol. 2, 391:5–13. In addition, he relied upon his familiarity with the project, which he acquired when he helped Precon develop the narratives for its REAs. Id. at 391:14–22. Further, as he was preparing his analysis, Mr. Kelly spoke with Mr. Diggs and Mr. Boyce, both of whom had first-hand knowledge of the project. Id. at 396:5–8.

Mr. Kelly testified that the methodology he employed "compares two schedules, the planned and the actual, and it measures the variance between the two." Id. at 387:15–17. That variance represents the delay. Id. at 387:15–19. Mr. Kelly did not rely on the as-built schedule to determine which tasks were on the critical path. Instead, he testified that "in this case, you can look at the plan and identify the critical path, and when you compare the performance of the job, the obstructions that were incurred, and how that affects the activities in the sequence, the effect was upon the critical path." Id. at 433:2–8.

Mr. Kelly acknowledged that the as-planned versus as-built methodology "is a simple way of looking at delay and it is subject to criticism as being not dynamic, too simplistic, too basic." Id. at 387:2–7. Nonetheless, he testified, it is an approach that is in "the portfolio of methodologies," and can be used as a "methodology . . . for proving critical path impact." Id. at 387:10–12.

Mr. Kelly also acknowledged that a "very unique set of circumstances" is required for the as-planned versus as-built methodology to be "meaningful." Id. at 387:12–14. Those unique circumstances were present in the TC Dock project, he testified, because of the project's simplicity. Id. at 387:24–388:2. Mr. Kelly explained that "there [were] minimal logic changes" in the work sequence. Id. at 390:6–7. He testified that, "in terms of the work within each phase, no matter what happened, it was remove the deck, drive the piles, put the deck back in place." Id. at 390:9–12. Because the dock project was so "simple, repetitive, [and] linear," and because it was "further broken down into isolated phases," he explained, the as-planned versus as-built approach was "a very meaningful methodology for this project in these circumstances." Id. at 388:13–18, see also id. at 432:14–23; JX 159 at 46 (AACE International Recommended Practice No. 29R-03: Forensic Schedule Analysis, listing considerations in employing the as-built versus as-planned method, including that it is "[s]uitable for analyzing short projects with minimal logic changes," that it "[c]an be performed in a manner that is easy to understand and simple to present," that it requires as-built and as-planned activities to be "closely correlated," and that it "[c]an be performed with very rudimentary schedules and as-built data"), ECF No. 87-9.

### 3. The Government's Challenge to the Methodology of Slone's Delay Expert

The government challenges the quality of Mr. Kelly's methodology, citing the testimony of its own expert witness, James Beach. Mr. Beach is a professional civil engineer with some

fifty years of experience in construction claims and scheduling.[11] See Trial Tr. vol. 3, 629:25–630:1, 631:17–637:21. Mr. Beach was tasked with reviewing Mr. Kelly's expert report to form an opinion whether the report "legitimately or properly documented delays." Id. at 638:5–20. He also reviewed the contract plans, specifications, and documents, both certified claims (i.e., JXs 144 and 146), the transcripts of the depositions of Mr. Diggs and Mr. Fowler, and the modifications, REAs, and RFIs submitted throughout the course of the project. Id. at 639:2–24. Finally, he examined the schedules Mr. Kelly used to create his report, including native files and all of the schedule updates. Id. at 640:5–14.

Mr. Beach testified that "the term 'critical path analysis' really is an umbrella [term], and there's various forms of critical path analysis under that umbrella," such as "a time impact analysis . . . [or] a windows analysis." Trial Tr. vol. 3, 646:5–10. An as-planned versus as-built method, he testified, does not fall under the Critical Path Methodology ("CPM") "umbrella." Id. at 647:3–5. And, although the as-planned versus as-built methodology is "widely recognized" in the industry, he testified, it is not "highly regarded." Id. at 642:7–16. The method is used, he noted, "because sometimes [there is no] critical path schedule on a job and you don't have anything else," and because "it's less expensive to use" and "could be quicker." Id. at 643:14–21.

Citing Mr. Beach, the government argues that Mr. Kelly did not use CPM when conducting his delay analysis and that, as a result, his conclusions lack credibility. Def.'s Br. at 66, 68–72. Whether an as-planned versus as-built analysis technically falls under the "Critical Path Methodology" umbrella seems to the Court immaterial. The parties agree that the tasks on the critical path were making holes in the concrete deck, installing piles, and then closing up the deck. The Court understands that Mr. Kelly used the as-planned and as-built schedules to determine whether the obstructions Precon encountered (and/or the modifications the Navy imposed) prevented Precon from performing these critical path tasks within the time periods prescribed in the as-planned schedule and, if so, to what extent. Mr. Kelly acknowledged that the as-planned/as-built methodology he employed is only meaningful in this case because of the simplicity of the project and its linear nature. The Court found Mr. Kelly's testimony as to these points persuasive.

It also finds that Mr. Kelly's analysis comports with the methodology required to prove delay damages under the Contract. Specifically, Section 1.8 of the Contract provides that no "delay/disruption damages [will be] paid unless the delay impacts the Project's critical path, consumes all available float, and extends the work beyond the Contract Completion Date." JX 3 at 29. The delays for which the Court awards Slone delay damages below relate to the installation of the piles, a task that both parties agree was on the critical path. There was zero float available for pile installation; thus, any circumstances that prevented Precon from installing a pile on schedule by definition had an effect on the critical path.

---

[11] The Court qualified Mr. Beach as an expert in claims analysis. Trial Tr. vol. 3, 637:22–638:1. He holds a Master of Science in civil engineering from Columbia University and an MBA from Rutgers University, which he earned after receiving a Bachelor of Science in engineering from the United States Coast Guard Academy and a Bachelor of Science in civil engineering from the University of Illinois. Id. at 630:13–631:5.

Mr. Beach also criticized Mr. Kelly for relying on the two schedules Plaintiff's counsel provided him, allegedly without knowing "who prepared them, . . . if they were used, . . . [or] who relied upon them." Trial Tr. vol. 3, 650:3–7. Mr. Beach explained that an as-built schedule is generated by computer software by "adding in actual start dates [and] actual finish dates" to "a baseline schedule" contemporaneously each time one needs to "do an update." Id. at 651:5–21. In this case, "at the end of the job, there was an as-built schedule on the project that was created during the course of the project contemporaneously with the project." Id. at 651:18–21. Mr. Beach noted that he did not understand why Slone used an as-planned/as-built analysis given that it had "the tools to do a critical path analysis," namely, the computerized schedule. Id. at 645:3–12.

Mr. Beach further testified that he found discrepancies when he compared the native file for the as-built schedule with the as-built schedule Mr. Hughes created and Mr. Kelly used. Id. at 651:23–652:16. Mr. Beach opined that the Kelly report could not support "any delay analysis or any delay claim based on the fact that it's using data that is, in [his] mind, unsubstantiated, not project documents, and a methodology that's inferior." Id. at 655:3–8, see also id. at 652:6–16.

The Court is unpersuaded by the government's contention that the as-built schedule Mr. Kelly used was "flawed and unreliable." See Def.'s Br. at 66. While Mr. Beach testified generally that he had compared dates on the contemporaneously created as-built schedule with dates on the as-built schedule Mr. Hughes created, and found discrepancies, his testimony on the subject was not specific as to what the discrepancies were or if they were material ones. See Trial Tr. vol. 3, 652:6–16. In that regard, the Court notes that Mr. Beach ultimately calculated the same number of days of delay in the critical path as Mr. Kelly had. See id. at 668:2–669:1 (acknowledging twenty days of delay for Phase 1), 669:7–16 (conceding that his only critique of Mr. Kelly's Phase 2 analysis, which was not about the number of days, was incorrect), 666:8–667:7 (recalling that his report, like Mr. Kelly's, listed 141 days of delay for Phase 3), 663:5–17 (agreeing on sixty-two days of delay for Phase 4). One would surmise that if the as-built schedule Mr. Kelly used for delay analysis was as "flawed and unreliable" as the government would have it, there would be no agreement on the length of delay between the two parties, let alone agreement on the length of delay for each phase. The Court thus finds that Mr. Kelly's methodology was reliable given the unique circumstances of this case, in which the project was a simple and linear one.

### 4. Phase 1 Delays

As noted, Slone alleges that it experienced twenty days of compensable delay during Phase 1.[12] Slone, however, has not produced any evidence that shows the reason for the delay in completing Phase 1, much less that the Navy's actions were the sole proximate cause of it. See Triax-Pac., 958 F.2d at 354 (To establish compensable delay, a plaintiff must show that the

---

[12] The record shows that Phase 1 was scheduled to be completed by September 30, 2011, but that it was not actually completed until October 24, 2011 (twenty-four days late). Slone claims twenty (rather than twenty-four) days because the Navy extended the deadline for completion of Phase 1 by four days in Modification No. 11. Pl.'s Suppl. Br. at 2 (citing JX 64 (Modification No. 11)).

government is "the sole proximate cause of the contractor's additional loss, and the contractor would not have been delayed for any other reason during that period.").

At trial, Slone's expert, Mr. Kelly, testified that his analysis revealed that the government was responsible for all of the delays he identified, including those that occurred during Phase 1. Trial Tr. vol. 2, 398:11–18. But he did not provide any support for that conclusion, and none is apparent from the Court's review of the record. Further, Slone did not address the issue in its post-trial briefs or closing argument.

The Court gave Slone an opportunity to file a supplemental post-trial brief to identify which parts of the record supported Slone's contention that the Navy's actions caused Phase 1 to run twenty-four days past the contractual completion date. Post-Trial Suppl. Br. Order, ECF No. 92. In that brief, Slone asserted (for the first time, so far as the Court can tell) that the delay was attributable to the Navy's failure to respond to RFIs 29 and 35 within twenty days, which it alleges was the deadline set forth in the Contract. Pl.'s Suppl. Br. at 2, ECF No. 94 (citing JX 3 at 36).

To begin with, the Court is not persuaded by Slone's argument—also articulated for the first time in its supplemental post-trial brief—that the Contract imposed a twenty-day deadline on the Navy for responding to RFIs. Slone cites Section 1.5.2(a) of the contractual specifications, which is part of a section entitled "Procedures for Submittals." Id.; see also JX 3 at 36. The entire section deals with how the contractor goes about securing Navy approval for its "submittals" (i.e., test reports, plans, manuals, drawings, etc.). See JX 3 at 31–34 (identifying categories of "submittals"). It is not clear to the Court that the provision Slone relies on is even applicable to RFIs.

Further, even assuming an RFI is a "submittal," the reference to twenty days that is contained in Section 1.5.2(b) directs the contractor to, "[e]xcept as specified otherwise, allow review period, beginning with receipt by Approving Authority, that includes at least 15 working days for submittals for QC Manager approval and 20 working days for submittals for Contracting Officer approval." Id. at 36. This provision does not impose a deadline on the Navy; rather it advises the contractor to allow at least twenty working days for the CO to act on "submittals."

To be sure, the government has a contractual obligation to respond to RFIs in a reasonably timely manner. See Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (noting that, "[w]hen the contract does not specify the period in which the government must respond, 'the law imposes an obligation to act within a reasonable period of time'" (quoting Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 565 (Ct. Cl. 1966))). But Slone failed to put on evidence at trial to support any theory that the delays in Phase 1 were caused by unreasonably late responses to the two RFIs it cites in its supplemental post-trial brief. In fact, none of its witnesses even mentioned RFIs 29 and 35, and neither RFI is in the record.

Further, Slone's supplemental post-trial brief is riddled with erroneous or inapposite citations that do not support the propositions for which they are used. For example, in the brief, Slone asserts that it submitted RFI 29 on July 18, 2011. Pl.'s Suppl. Br. at 2. It supports that assertion by citing JX 166 at 95, which it identifies as the notes from "Weekly Progress Meeting

40

No. 25." Id. But JX 166 at 95 is an invoice for a Precon worker's stay at the Suburban Extended Stay Hotel near the Charleston Airport, not a note from a progress meeting. ECF No. 88-6.

Similarly, in its supplemental post-trial brief, Slone asserts that "[t]he Government failed to timely respond to RFI No. 29," but provides no supporting citation. Pl.'s Suppl. Br. at 2. It then asserts that the "failure to respond as of September 27, 2011 resulted in a 51-day delay to the work at bent location 150." Id. To support that assertion, Slone cites Section 1.5.2(a) of the contractual specifications, without explaining its relevance. Id. at 2 n.8.

Similarly, Slone states that it submitted RFI 35 on August 13, 2011. Id. at 2. Yet again, Slone does not cite to the RFI. It instead cites to pages 36 and 97 of the contractual specifications, which appear to be wholly irrelevant to the proposition for which they are cited. Id. at 2 n.9. Slone then alleges that "[t]he Government did not respond with direction to perform these repairs until the week of October 11, 2011," but does not cite to anything to substantiate this allegation. Id. at 2.

Perhaps there is legal theory and/or evidence in the record to support an award of damages based on twenty days of delay during Phase 1. Perhaps the Navy took an unreasonable amount of time to act on Slone's RFIs and the delay in responding prevented Slone from completing Phase 1 on time. But as more than one court has observed, "[J]udges are not like pigs, hunting for truffles buried in briefs or the record." Jones v. Kirchner, 835 F.3d 74, 83 (D.C. Cir. 2016) (quoting Est. of Parsons v. Palestinian Auth., 651 F.3d 118, 137 (D.C. Cir. 2011) (Tatel, J., concurring)); see also Arunachalam v. Int'l Bus. Machines Corp., 989 F.3d 988, 1000–01 (Fed. Cir. 2021) (quoting SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006)). The Court provided Slone with an opportunity to clarify the basis for its claim, and it failed to do so. Therefore, the Court finds that Slone has not established its entitlement to any compensable delay with respect to its late completion of Phase 1.

### 5.   Phase 2 Delays

Mr. Kelly testified that during Phase 2, the contractor incurred forty-seven days of delay, as to which the Navy granted a fourteen-day extension through contract modifications. Trial Tr. vol. 2, 400:14–23. That left a balance of thirty-three days of entitlement according to Mr. Kelly. Id.

According to Slone, the delay to the critical path during Phase 2 occurred because of pile obstructions at bents 100.5 A-B, 100.5 B-C, and 96.5 F-G. See Pl.'s Br. at 88; Pl.'s Suppl. Br. at 3–4. The government does not dispute that these obstructions constituted differing site conditions, and the Court finds that it was these differing site conditions that caused the critical path delay.

However, Slone's math (as well as Mr. Kelly's) is off. Slone states that the Navy granted it a fourteen-day extension to address these obstructions (two days in Modification No. 10, one day in Modification No. 11, and eleven days in Modification No. 12). See Pl.'s Suppl. Br. at 3. But Modification No. 12 granted Slone a twenty-seven-day extension, not an eleven-day extension. JX 83 at 2. Therefore, the Court finds that Slone is entitled to seventeen, and not thirty-three, days of compensable delay during Phase 2.

### 6.    Phase 3 Delays

Slone has asserted that it experienced 141 days of compensable delay during Phase 3. Pl.'s Br. at 89. The delays were caused by the fact that two of the piles Precon installed sustained damage upon installation, and therefore had to be removed and replaced. As explained earlier in this Opinion, however, Slone's argument that the damage to the two piles was caused by a Type 1 or 2 differing site condition lacks merit. Therefore, Slone has not shown—as it must to establish compensable delay—that the government's actions were the proximate cause of the delay.

In its supplemental post-trial brief, Slone alleges that—even if the Court rejects its argument that the damaged piles resulted from differing site conditions—it is entitled to damages for seventy-eight days of delay allegedly caused by its performance of the additional work required under Modification No. 4; Modification No. 5, Items 1, 4, 5, 6, 7, and 8; and Modification No. 7. Pl.'s Suppl. Br. at 6–8.

But even assuming that Slone had shown that these modifications resulted in seventy-eight days of delay to the critical path, it has not established that the delays are compensable. Slone observes that these alleged delays occurred "[c]oncurrently" or "in parallel" to the 141 days of delay arising out of the two damaged piles. Id. at 6. As explained above, however, to establish compensable delay, a plaintiff must show that the government is "the <u>sole</u> proximate cause of the contractor's additional loss, and the contractor would not have been delayed for <u>any other reason</u> during that period." <u>Triax-Pac.</u>, 958 F.2d at 354. "If a period of delay can be attributed simultaneously to the actions of both the Government and the contractor, there are said to be concurrent delays, and the result is an excusable but not a compensable delay." <u>Morganti Nat'l, Inc. v. United States</u>, 49 Fed. Cl. 110, 132 (2001) (citing <u>Weaver-Bailey Contractors, Inc. v. United States</u>, 19 Cl. Ct. 474, 476 (1990)). Slone's acknowledgement that the seventy-eight days of delay for which it seeks compensation occurred concurrently with the 141 days of delay for which it bears responsibility is fatal to its claim that it is entitled to be compensated for the seventy-eight days of delay that it alleges the government caused.

### 7.    Phase 4 Delay

Finally, the Court finds that Slone has established its entitlement to sixty-two days of delay damages for Phase 4 caused by the actions the government directed in response to Precon's encounter with riprap and concrete slabs in the Phase 4 area. In Modification No. 15, the government directed Slone to remove the deck at certain pile bays, excavate the riprap, probe four locations to find an allowable driving location, install the piles, reinstall the riprap, and reconstruct the deck. JX 87 at 2. Mr. Kelly testified that executing the government's directions resulted in a 102-day delay in the completion of Phase 4. Trial Tr. vol. 2, 402:19–403:4. The 102 days of delay were offset by the twenty-one and later nineteen-day extensions of Phase 4 that the Navy provided in Modification Nos. 15 and 18, respectively. <u>See id.</u>; JX 87 at 2 (Modification No. 15); JX 140 at 3 (Modification No. 18). Therefore, Slone argues, the government's expert agrees, and the Court finds, that Slone is entitled to sixty-two days of delay damages for Phase 4. <u>See</u> Pl.'s Br. at 94 (citing Trial Tr. vol. 3, 663:5–17, 665:1–19 (Beach testimony on Phase 4 delay)).

Further, because Slone's additional work was performed at the direction of the government, the delay in completion was excusable as well as compensable. It was therefore improper for the government to assess liquidated damages in the amount of $33,800 for that delay.

### 8. Total Delay Damages Due

Slone contends that it is entitled to $114,287.99 in damages for the ninety-five delay days in year two, or $1,203.03 per day. See Pl.'s Reply at 75–76; JX 165 at 22. Mr. Diggs testified—and the Court finds—that this amount was based on the per diem for direct labor, management costs, equipment, and hotel accommodations. Trial Tr. vol. 1, 167:17–19.

For the reasons set forth above, Slone is entitled to seventeen days of delay damages for Phase 2 and sixty-two days for Phase 4. The average daily delay cost during Phases 2 and 4, however, is not $1,203.03, as Slone argues. Pl.'s Reply at 76. Slone calculated the $114,287.99 total based on 139 days of delay for year two. JX 165 at 22; JX 148 at 4 (Slone's claim two, stating that 139 critical path delay days were incurred during year two); Trial Tr. vol. 1, 167:12–19 (Diggs testifying that, "[i]n year two, the cost of delays for the 139 days . . . was a total of $114,287.99"). The average daily cost for delay damages during year two is therefore $822.22 (i.e., $114,287.99 divided by 139). This amounts to $13,977.74 in delay damages during Phase 2 (i.e., $822.22 times 17) and $50,977.64 during Phase 4 (i.e., $822.22 times 62). The amount of delay damages to which Slone has established entitlement, therefore, is $64,955.38.

### C. Indirect Costs

On the basis of the foregoing, Slone's direct costs (actual costs plus compensable delay) total $1,000,710.22. In addition to those costs, Slone seeks a further adjustment based on the indirect costs incurred. It proposes that Precon receive 12% of its direct costs for profit and 1.0066% for its bond premium. Pl.'s Br. at 118; JX 144 Part 1 at 14; JX 146 at 9. Slone further claims an entitlement to recover its own overhead (2.5% of subcontract work), profit (5%), and bond premium costs. Trial Tr. vol. 2, 307:16–308:24.

Mr. Kilpatrick testified that the percentages Slone employed were consistent with those it used when bidding on the task order. Id. at 308:10–24. The government does not challenge the percentages Slone proposes to use to calculate profit, overhead, and bond costs. The Court concludes that they provide a reasonable basis for calculating the indirect costs that Precon and Slone incurred.

Slone also claims entitlement to both direct and indirect costs incurred by Batson. But so far as the Court can tell, the record does not include any itemization of Batson's direct and indirect costs; it does so only for Slone and Precon. See JX 144 Part 1 at 14 (calculations for Precon's costs for claim one); JX 146 at 9 (calculations for Precon's costs for claim two); JX 148 at 1–6 (Slone's claim one and claim two).

To be sure, one can deduce the total costs (both direct and indirect) that Batson is alleging it incurred by looking at the claim packages. The claim letters supply the cumulative amount Slone alleged it was due in direct and indirect costs for both Precon and Batson in year one ($1,119,204.88) and year two ($1,281,980.53). JX 148 at 1 (year one), 4 (year two). The

letters also supply the total direct and indirect costs attributable to Precon alone ($957,402.13 in year one and $1,100,973.03 in year two). Id. If one subtracts Precon's costs from the total costs in Batson's claim letter, the difference represents the portion of the claim that is composed of Batson's alleged costs: $161,802.75 for year one and $181,007.50 for year two.

But the basis for these claimed costs is unclear. Robert Trice, a Batson project executive, stated that he prepared the portion of the claim covering Batson's costs. Trial Tr. vol. 2, 344:15–19. Mr. Trice stated that he took Precon's claim and reviewed it, and then added onto that claim the costs Batson incurred for a health and safety officer, the disposal of extra debris Precon encountered, the extra time that Batson's trailer remained on site, and then its overhead and markups, as well as Mr. Trice's time. Id. at 338:14–20, 350:13–16. The Court has reviewed the record and is unable to find any breakdown of the actual costs or an explanation of how Batson calculated its overhead and markups.

Kevin Kilpatrick, a Slone executive who reviewed Batson's claim packages, testified that he understood claim one to include Batson's "direct field costs, as well as personnel, overhead, markups, et cetera." Id. at 306:2–7. He similarly testified that claim two consisted of Batson's "direct field costs, due to the changes and delays, as well as markups and overhead." Id. at 315:19–22. Mr. Kilpatrick asserted that Slone performed due diligence on the numbers, "analyz[ing] Batson's] impacts . . . with backup, daily field reports, payrolls, et cetera." Id. at 315:23–316:4 (claim two); see also id. at 306:14–21 (Mr. Kilpatrick affirming that he performed due diligence on Batson's claim one amount, relying on "supporting data" and "personal knowledge of the project"). But again, there was no specificity at all in his testimony regarding the amounts of the costs incurred in each of these categories.

Plaintiff's briefs are no more helpful; in fact, they create further confusion. In its post-trial brief, Slone provides a citation to JX 148 at 7–10 in support of its assertions that "Batson-Cook is entitled to a total of $197,110.25 for indirect costs," "$161,802.75 in profit and its bond premium" for year one, and "$181,007.50 in profit and for its bond premium" for year two. Pl.'s Br. at 118. But the amounts recited are for Batson's entire claims each year, not for the amount attributable to its profits and bond premium.

Slone further states in its post-trial brief that if the Court were to award "only a portion of the direct damages Precon Marine is seeking," then "Batson-Cook is entitled to 16% for profit and its bond premium for the amount awarded in direct damages." Id. at 119. In its post-trial reply brief, Slone contends that Batson should be awarded 16.9% for its direct and indirect costs, overhead, profit, and bond premium. See, e.g., Pl.'s Reply at 24–25, 43.

None of Slone's witnesses relied on these figures or explained where they came from. In its reply brief, Slone states that the 16.9% figure is "an estimated percentage" that is derived by taking Batson's claim amounts and dividing it by Precon's claim amounts. Id. at 43 n.168. This formula, however, is only valid to the extent that the original amounts that Batson claimed are legitimate and valid. And, for the reasons set forth above, the Court has no basis for concluding that they are. See Sonoma Apartment Assocs. v. United States, 939 F.3d 1293, 1299 (Fed. Cir. 2019) ("[I]t is not enough to merely assert entitlement to damages without offering evidence in support."). The Court therefore is not able to award damages to Slone based on Batson's alleged actual and indirect costs.

44

The total amount of direct damages (actual costs plus delay damages) incurred by Precon is $1,000,710.22. Precon's profit would be $120,085.23 (12% of $1,000,710.22) and its bond premium would be $11,281.93 (1.0066% of $1,120,795.45). See JX 144 at 14 (calculation of Precon's year one claim). Slone's overhead is $25,017.76 (2.5% of $1,000,710.22), its profit is $50,035.51 (5% of $1,000,710.22), and its bond costs are $10,828.64 (1.0066% of $1,075,763.49). See JX 148 at 3 (calculation of Slone's year one claim).

## CONCLUSION

Based on the foregoing, the total amount (direct costs + delay damages + indirect costs + recission of $33,800 in liquidated damages + $100) of damages Slone incurred is $1,251,859.30.[13] This total must be offset by the $586,032.10 in equitable adjustments to the contract price that the Navy provided.[14] Therefore, the Clerk is directed to enter judgment for Slone in the amount of $665,827.20, plus interest pursuant to 41 U.S.C. § 7109.[15]

**IT IS SO ORDERED.**


s/ Elaine D. Kaplan_____
ELAINE D. KAPLAN
Chief Judge

---

[13] At trial, Mr. Kilpatrick testified that there is $100 open on the Contract, to be paid to Slone upon resolution of its claims. Trial Tr. vol. 2, 320:14–21; Trial Tr. vol. 4, 684:8–12, 685:8–10; see also Pl.'s Br. at 116 ("The Claim also requested the release of $100 left on the Contract."). The government did not object to this amount at trial or in its post-trial briefing.

[14] The breakdown of equitable adjustments are as follows: $10,000 for the two deleted polymeric piles in Modification No. 5, see discussion supra Part I.D.7.; $10,000 for the two deleted polymeric piles in Modification No. 7, see discussion supra Part I.E.; $2,590.72 for the removal of thickened slabs at bents 96.5 E-F and 97.5 E-F in Modification No. 11, JX 64 at 2; $93,390.38 for Modification No. 12, JX 83 at 2; $174,268 for Modification No. 15, JX 87 at 2; and $295,783 in Modification No. 18 for Modification Nos. 5, 7, 12, and 15, JX 140 at 3–4; see also Pl.'s Br. at 122 n.489 (stating that Slone's total requested amount "incorporates the offset of amounts previously paid to Slone through Modification Nos. 11, 12, 15, and 18.").

[15] A plaintiff who succeeds on a CDA claim is entitled to interest. Nova Grp./Tutor-Saliba, 159 Fed. Cl. at 65 (citing 41 U.S.C. § 7109). Interest accrues "beginning with the date the contracting officer initially receives the contractor's claim until the date of payment of the claim." 41 U.S.C. § 7109(a)(2).